Argued and submitted December 4, 1985, Court of Appeals reversed, remanded to
ERB for further proceedings April 1, 1986

GILLAR,
*Petitioner on Review,*

*v.*

EMPLOYMENT DIVISION,
*Respondent on Review,*

(EAB 84-AB-1420; CA A33953; SC S32038)

Steven N. Thomas, Pendleton, filed the petition for review for petitioner on review. With him on the petition was Oregon Legal Services Corporation, Pendleton Regional Office, Pendleton.

Christine Dickey, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General.

CAMPBELL, J.

### CAMPBELL, J.

The issue in this case is whether claimant is entitled to receive unemployment compensation under ORS 657.184 which provides:

"Benefits shall not be paid on the basis of services performed by an alien unless such alien is an individual who has been lawfully admitted to the United States for permanent residence or to perform such services, or otherwise is *permanently residing in the United States under color of law,* including an alien who is lawfully present in the United States as a result of the application of the provisions of section 203(a)(7) or section 212(d)(5) of the Immigration and Nationality Act. (Emphasis added.)[1]

In this case claimant was not admitted to the United States for "permanent residence" nor to perform specific services. If claimant is entitled to benefits it is because he was "permanently residing in the United States under color of law" at the relevant time periods.

Claimant was born in Czechoslovakia and entered this country in Florida on a visitor's visa in 1977. In 1978 he applied for political asylum. In 1980 he moved to Portland and in 1981 was notified that his asylum request had been denied. The Immigration and Naturalization Service (INS) gave claimant an opportunity to depart the country voluntarily,[2] but claimant elected to renew his asylum request before an immigration judge.[3] Such a renewal can only take place in an exclusion or deportation hearing. Claimant requested a hearing which was held in December 1981. No decision had been issued at the time this case was argued.

---

[1] Sections 203(a)(7) and 212(d)(5) of the Immigration and Nationality Act provided for the conditional entry and temporary parole of certain aliens into this country.

[2] 8 CFR section 208.8(4) provides:

"(4) *Applicant in the United States.* If a request for asylum or extension of asylum by an alien in the United States is denied, the district director may in his discretion, grant voluntary departure pursuant to O.I. 242.10, or commence deportation proceedings pursuant to 8 CFR 242.1."

[3] 8 CFR section 208.9 provides:

"Where an application for asylum is denied by the district director, the applicant may renew his/her request for asylum before an immigration judge in exclusion or deportation proceedings."

While in Oregon, claimant filed for unemployment benefits for two periods of time: from September 26, 1982 through September 24, 1983; and from September 25, 1983 through September 22, 1984. Both claims were denied by the Employment Division's authorized representative. The representative found that claimant was "an alien and not lawfully authorized or admitted to perform services."

Claimant requested a hearing. The referee upheld the denial of benefits. The referee's conclusion "reject[ed] claimant's basic contention: that he was in the country under color of law and was eligible for wage credits under ORS 657.184." The referee found that where deportation proceedings had commenced the INS had not acquiesed in claimant's presence and therefore had not provided him with the "color of law" necessary to collect unemployment benefits.

On review the Employment Appeals Board (EAB), with one dissent, affirmed and adopted the referee's decision. The dissenting member agreed with claimant's arguments and would have found that the Employment Division had not met its burden of proving that claimant had not been issued work authorization in 1977.[4] The Court of Appeals affirmed the EAB without opinion. 74 Or App 365, 704 P2d 553 (1985).

ORS 657.184 does not explain the meaning of the phrase "permanently residing in the United States under color of law." The available legislative history is also unhelpful. ORS 657.184 was adopted in 1977 as a part of House Bill 2131. The bill incorporated the requirements of the Federal Unemployment Compensation Law relating to school employees and the eligibility of illegal aliens and professional athletes. ORS 657.184 was adopted in order to retain the benefits provided by the Federal Unemployment Tax Act (FUTA), 26 USC sections 3301 to 3311 (1982). The act was a way for Congress to impel adequate state unemployment programs without having to create a national unemployment system. *See Salem College & Academy, Inc. v. Empl. Div.,* 298 Or 471, 476, 695 P2d 25 (1984). FUTA provided for a federal payroll tax on employers which could be offset by making

---

[4] Throughout these proceedings claimant has presented testimony that he was issued work authorization in Miami in 1977. The Miami INS records do not reflect that this authorization was issued, but claimant's INS records have been lost on other occasions. The referee made no finding of fact with respect to this dispute.

payments to a state unemployment program that met certain federal standards. 290 Or at 476. Section 3304, the model for ORS 656.184, was one such requirement.[5]

Most of the legislative discussion centered on the status of school employees. The only comment relating to aliens is contained in Exhibit "C" of the House Labor Committee exhibit file:

"Section 5 of the bill is a federal requirement to deny benefits to illegal aliens. We [the employment division] anticipate an administrative problem in identifying these persons; however, we expect the incidence of suspected cases to be rather slight."

This court must now define "these persons" for purposes of Oregon law without the help of clear statutory language or legislative history. Our only assistance is in the form of opinions from other states and the lower federal courts.[6] The interpretation of "permanently residing * * * under color of law" is best accomplished by dividing the phrase into two parts: "permanently residing" and "color of law."

## I. *COLOR OF LAW*

There are several questions to answer in defining "under color of law." Initially, should the alien or the INS be

---

[5] 26 USC section 3304(a)(14)(A) provides:

"(a) Requirements.—The Secretary of Labor shall approve any State law submitted to him, within 30 days of such submission, which he finds provides that—

"(14)(A) compensation shall not be payable on the basis of services performed by an alien unless such alien is an individual who was lawfully admitted for permanent residence at the time such services were performed, was lawfully present for purposes of performing such services, or was permanently residing in the United States under color of law at the time such services were performed (including an alien who was lawfully present in the United States as a result of the application of the provisions of section 203(a)(7) or section 212(d)(5) of the Immigration and Nationality Act)."

[6] Because of the nature of the relationship between FUTA and state law, federal interpretations of FUTA have a limited effect. The only binding federal decision would be a United States Supreme Court decision on the interpretation or constitutionality of the federal law. Lower federal decisions does not relieve this court of the responsibility to interpret the statutory test under state law. "[A] state supreme court does have to reach a final decision as to the state law that seeks to take advantage of the disputed federal statute." *Salem College & Academy, Inc v. Emp. Div.*, 298 Or 471, 478, 695 P2d 25 (1984).

the focus of the analysis? And secondly, must that party act in an affirmative manner or will inaction provide "color of law?"

Use of the term "under color of law" is relatively new in unemployment laws. It is therefore helpful to examine the interpretation of the phrase in other fields of law. As far back as 1866 the term has focused on the acts of government officials.

The Civil Rights Act of 1866 made the commission of certain discriminatory actions a criminal offense if committed *"under color of* any *law,* statute, ordinance, regulation or custom * * *." (Emphasis added.) The intent at that time was to punish "persons acting under State authority in some sort of official capacity * * *." 1 *Statutory History of the United States: Civil Rights* 135 (Schwartz ed 1970), *quoting* debates of 39th Cong. 1st Sess, March 1866 (Comment of Rep. Michael Kerr).

The 1866 language was later adopted as Section 1 of the Ku Klux Act of 1871 and became the model for the present civil rights protections of 42 USC section 1983 and its criminal counterpart 18 USC section 242. Those sections use similar language in prohibiting discriminatory actions *"under color of* any statute, ordinance, regulation, custom, or usage, of any State or Territory * * *." (Emphasis added.) This language has been interpreted as requiring state action. *See Adickes v. Kress & Co.,* 398 US 144, 152, 90 S Ct 1598, 26 L Ed 2d 142 (1970). The United States Supreme Court has consistently reaffirmed the rule that "[m]isuse of power, possessed by virtue of state law and made possible because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *United States v. Classic,* 313 US 299, 326, 61 S Ct 1031, 85 L Ed 1368 (1940); *see also Monroe v. Pape,* 365 US 167, 184, 81 S Ct 473, 5 L Ed 2d 492 (1961).

A similar definition of "color of law" has been applied by the Second Circuit. *See Holley v. Lavine,* 553 F2d 845 (2d Cir 1977). *Holley* did not involve unemployment laws; the case dealt with a Social Security Act regulation which required state plans of aid to families with dependent children to include an alien "permanently residing in the United States

under color of law."[7] In *Holley* the claimant was a deportable Canadian citizen with six American citizen children who were denied AFDC payments because of their mother's status. The circuit court held that when the INS sent claimant a letter indicating that she would not be deported at least until her children were grown, the INS gave "color of law" to claimant's status in the United States. 553 F2d at 850. The court defined "color of law" as "that which an official does by virtue of power, as well as what he does by virtue of right." 553 F2d at 849. In *Holley*, the INS exercised its discretionary power in not enforcing the letter of the law.

■ *Holley* is the leading case on this issue and has been cited with approval throughout the country. There does not appear to be any reason to shift a "color of law" focus away from the actions of the INS. It is by the acts of the INS that an alien's presence in this country is legitimated (*i.e.*, by granting permanent residence, asylum, etc.), and so our focus should remain on INS action.

■ We must now decide what INS acts or omissions will provide an alien's presence in this country with "color of law." There have been relatively few cases which have attempted to set requirements of this type, but there are some generalizations which can be made. It is clear that where the INS has issued work authorization to an alien, the alien is present "under color of law." *See Arteaga v. Industrial Com'n of State,* ___ Colo App ___, 703 P2d 654 (1985); *Zanjani v. Industrial Com'n of Colorado,* ___ Colo App ___, 703 P2d 652 (1985);[8] *Yatribi v. Indus. Com'n of State of Colo,* ___ Colo App ___, 700 P2d 929 (1985); *Vazquez v. Rev. Bd. of Indiana Emp. Sec. Div.,* ___ Ind App ___, 487 NE2d 171 (1985). Also, where the INS has a policy against deportation in specific situations, the INS

---

[7] The federal regulation at issue in *Holley v. Lavine,* 553 F2d 845 (2d Cir 1977), contained the same "permanently residing * * * under color of law" language as is found in ORS 657.184 and 26 USC section 3304 (a)(14)(A). That language is now codified in 42 USC section 602(a)(33) governing aid to families with dependent children.

[8] In the fall of 1985 *certiorari* was granted in both *Arteaga* and *Zanjani*; no opinion has been issued at this time. These cases have also been discussed by the Federal District Court for the District of Colorado. *See Esparza v. Valdez,* 612 F Supp 241 (D Colo 1985)(suit for declaratory and injunctive relief). In *Esparza,* the court defined "color of law" as an "indefinite phrase often used to permit consideration of individual circumstances." 612 F Supp at 243.

in following this policy will give "color of law" to a claimant's status. *See Holley v. Lavine, supra,* (INS letter indicating claimant would not be deported); *Rubio v. Employment Division,* 66 Or App 525, 674 P2d 1201 (1984)(routine renewal of FORM I-210, granting voluntary departure period, while application for permanent residence pending); *Papadopoulos v. Shang,* 67 AD2d 84, 414 NYS 2d 152 (1979)(INS operating instruction prohibited deportation while petition for adjustment of status pending); *Division of Employment and Training v. Industrial Com'n,* ___ Colo App ___, 705 P2d 1022 (1985) (letter to claimant).

There are other state courts which have not required affirmative acts or policy of the INS in upholding or granting benfits to claimants. In these cases courts have found "color of law" when the INS had notice of an alien's presence but had taken no steps to deport that alien. *See Antillon v. Department of Employment Sec.,* 688 P2d 455 (Utah 1984); *Cruz v. Commissioner of Public Welfare,* ___ Mass ___, 478 NE2d 1262 (1985); *St. Francis Hospital v. D'elia,* 72 AD2d 110, 422 NYS 2d 104 (1979).

■ Rather than base our decision on INS inaction we believe that in order to provide a particular individual with "color of law," the INS must take some affirmative action or must have a policy prohibiting deportation. We also find that in this case such a policy is apparent in the interrelationship of the 1980 Refugee Act and the corresponding INS regulations.

At oral argument claimant asserted that asylum applicants are a special class of people and that Congress, by enacting the 1980 Refugee Act, had given a stamp of approval for asylum applicants to remain in this country pending a determination of their status. The Employment Division responded that asylum applicants are not a special class, and asylum is simply one way to gain entrance into this country.

■ 8 USC section 1158,[9] enacted as part of the 1980

[9] 8 USC section 1158(a) provides:

"The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title."

Refugee Act, provides the Attorney General with the discretion to grant asylum upon determining that an alien is a refugee as defined by statute.[10] However, that section does not, as claimant argues, indicate a congressional intent that every alien awaiting action on asylum applications shall not be deported. The power delegated in section 1158 is purely discretionary. The section which does evidence a congressional policy prohibiting deportation is 8 USC section 1253(h), but that provision has a limiting condition.

8 USC section 1253(h) provides:

"(h) Withholding of deportation or return

"(1) The Attorney General *shall not deport* or return any alien (other than an alien described in section 1251(a)(19) of this title) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." (Emphasis added.)

■■ Section 1253 is limited in its effect because it only prohibits the deportation of aliens who can carry the burden of proving a "clear probability of persecution" if deported. *INS v. Stevic,* 467 US 407, 413, 104 S Ct 2489, 81 L Ed 2d 321 (1984). That standard is different from the "well-founded fear of persecution" standard required to find that an alien is a refugee within 8 USC section 1101 (*see* note 10, *supra*). Refugee status alone does not require a withholding of deportation; an alien must also meet the section 1253 standard.

---

[10] 8 USC section 1101(42) defines "refugee" as:

"The term 'refugee' means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) in such special circumstances as the President after appropriate consultation (as defined in section 1157(e) of this title) may specify, any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing and who is persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. The term 'refugee' does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion."

*Stevic*, 467 US at 428. If an alien meets the section 1253 standard, then the congressional prohibition of deportation provides the alien with residence under "color of law."

 In the present case claimant's initial asylum application was not enough to provide him with the protections of section 1253(h). But when claimant renewed his request in front of an immigration judge, section 1253(h) became applicable. 8 CFR section 208.9 provides that the only procedure for renewing an asylum request is to bring the request before an immigration judge in a deportation proceeding. The regulations further provide that when an asylum request is made in a deportation proceeding, that request "shall also be considered as [a request] for withholding exclusion or deportation pursuant to section 243(h) [presently section 1253(h)] of the Act." 8 CFR section 208.3(b). As soon as claimant renewed his asylum request in front of the immigration judge, the judge obtained "[e]xclusive jurisdiction" over claimant's asylum application. 8 CFR § 208.1(b). Therefore, until the judge issues a ruling on claimant's status, the Attorney General's power to make a section 1253(h) determination is suspended. Since claimant cannot be deported unless the Attorney General makes the necessary findings under section 1253, claimant's residence in this country is, and has been, "under color of law."

## II. *PERMANENTLY RESIDING*

Although claimant is residing in this country under "color of law," he is not eligible for unemployment compensation unless he is "permanently residing." Claimant argues that when making this determination the focus should be on the claimant and not on extrinsic variables. He asserts that if an individual intends to reside permanently in the United States and has filed a claim with the INS which is indefinite in time (as opposed to an extension of a student or visitor visa with a clear ending date) then the individual is "permanently residing in the United States." If claimant is correct, the result would be that every alien awaiting action on an asylum application is "permanently residing" in this country.

"Permanent" is defined by 8 USC section 1101(a)(31):

"(31) The term 'permanent' means a relationship of

continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with law."

The term "temporary" is not defined anywhere in the statute, but we can infer its meaning by the way it is used elsewhere in the statute. The terms "temporary" and "temporarily" are used in 8 USC section 1101(a) in referring to students, tourists, business visitors and workers admitted for specific jobs. "The common characteristics of all of these temporary relationships is that they exist for a *defined purpose* with a *defined end,* and there is never any intention of abandoning the country of origin as a home." *Sudomir v. McMahon,* 767 F2d 1456, 1467 (9th Cir 1985) (Canby, J. dissenting) (emphasis added). In contrast, an asylum applicant has none of those characteristics. Asylum is only granted, under 8 USC section 1158, when the Attorney General determines that an alien is a refugee within the meaning of the Refugee Act (*see* note 10, *supra*). An alien awaiting action on an asylum application is present in the United States with no defined end or defined purpose. Thus, an asylum applicant fits within the statutory definition of "permanent" rather than within the statutory use of "temporary."

This definitional argument apparently has been rejected by the Ninth Circuit Court of Appeals. *See Sudomir v. McMahon, supra.* In *Sudomir* the court concluded:

"* * * the Secretary's [of Health and Human Services] assertion that Congress never intended to extend welfare benefits to aliens whose presence in the United States is unlawful and whose sole claim to entitlement rests on their filing applications for asylum with the INS is reasonable and, accordingly, permissible." 767 F2d at 1464.

*Sudomir* was not concerned with unemployment compensation; the issue was whether claimants were eligible for AFDC benefits under 42 USC section 602. The narrower issue was whether claimant met the subsection (a)(33) requirement of being an alien "permanently residing in the United States under color of law." That language is identical to the language of our statute.

The *Sudomir* majority affirmed the denial of benefits

finding that although claimants were present "under color of law," they were not "permanently residing." 767 F2d at 1461. The court indicated that the definition of "permanent" in 8 USC section 1101(a)(31) did not include persons occupying a temporary, transitory or inchoate position. 767 F2d at 1462. The court further held that asylum applicants occupy such an inchoate status since their presence in this country is merely "tolerated during the period necessary to process their applications * * *." 767 F2d at 1462. The court distinguished these asylum applicants from "temporary parolees" who are eligible for unemployment benefits.[11] The court noted that aliens who have the "official authorization [of the Attorney General] to remain indefinitely until * * * status changes" are permanently residing in this country. 767 F2d at 1462.

We think that the status of the claimant in this case is analogous to a temporary parolee. This position is supported by noting that the principal motivation for the 1980 Refugee Act was the elimination of the existing piecemeal approach to the admission of temporary parolees and conditional entrants under sections 203(a)(7) and 212(d)(5) of the Immigration and Nationality Act. *INS v. Stevic, supra,* 467 US at 425.

Under the above provisions, the United States Attorney General had broad discretion to parole large groups of aliens into this country pending a determination of final admissibility. Those aliens were permitted to receive various welfare benefits because they were "permanently residing in the United States under color of law." *Sudomir v. McMahon, supra,* 767 F2d at 1468. The Attorney General, by exercising his discretionary authority to allow these people into the country, legitimated their presence in this country. 767 F2d at 1462.

---

[11] A temporary parolee was first defined in section 212(d)(5) of the Immigration and Nationality Act. This definition now appears in 26 USC section 1182(d)(5)(A). A temporary parolee is an alien applying for admission to this country who is temporarily allowed into the country for emergent reasons or in the public interest. Once the purpose for the entrance is served, the alien is returned and the case is dealt with as that of any other applicant. ORS 657.184 provides that these aliens are eligible for unemployment benefits. These aliens are also eligible for unemployment compensation under 26 USC section 3304, and welfare benefits under 42 USC section 602 (aid to families with dependent children) and 42 USC section 1382c (supplemental security income).

In later years these sections were narrowed. The previous authority for paroling large groups of aliens was deleted. 8 USC section 1182(d)(5) now provides the Attorney General with the discretion temporarily to parole aliens into this country on an emergency basis. 8 USC section 1158, enacted as part of the 1980 Refugee Act, replaced the provisions allowing the wholesale parole of aliens with a system allowing aliens within the country to apply for asylum.

8 USC section 1158 provides the Attorney General with discretion to grant asylum. When the Attorney General permits applicants to remain in the United States, their situation is analogous to that of the temporary parolees of the past. Because these temporary parolees and conditional entrants are eligible for benefits under ORS 657.184, there is no logical reason to exclude individuals in claimant's position.

At least one other federal circuit court has interpreted "permanently residing" more broadly than *Sudomir*. In fact, two weeks after *Sudomir*, the Second Circuit issued an opinion reaffirming *Holley* and classifying the phrase "permanently residing * * * under color of law" as designed to be "adaptable and to be interpreted over time in accordance with experience, developments in the law, and the like." *Berger v. Heckler,* 771 F2d 1556, 1571 (2d Cir 1985). In *Berger,* where the issue was the interpretation of "permanently residing" for purposes of the supplemental security income statute,[12] the court indicated that an expansive approach to interpreting these words was "well-taken." 771 F2d at 1571.

State courts have also been more flexible than the *Sudomir* majority. State decisions have focused on the acts and circumstances of a particular individual in determining whether an alien is "permanently residing." One court found an individual to be "permanently residing" when the claimant

---

[12] 42 USC section 1382c provides in relevant part:

"(a)(1) For purposes of this subchapter, the term 'aged, blind, or disabled individual' means an individual who—

"* * * * *

"(B) is a resident of the United States, and is either (i) a citizen or (ii) an alien lawfully admitted for permanent residence or otherwise *permanently residing in the United States under color of law* (including any alien who is lawfully present in the United States as a result of the application of the provisions of section 1153(a)(7) or section 1182(d)(5) of Title 8)." (Emphasis added.)

had been in the country for twelve years and her mother had been awarded permanent resident status. *Cruz v. Commissioner of Public Welfare, supra.* The Colorado Court of Appeals has consistently found that where a claimant marries an American citizen, applies for permanent residence, and is issued INS work authorization, that claimant is "permanently residing" in this country. *See Zanjani v. Industrial Com'n of Colorado, supra; Arteaga v. Industrial Com'n of State, supra.*

██ ██ We too reject the *Sudomir* proposition that asylum applicants can never be "permanently residing" in this country and are therefore automatically ineligible for a variety of benefits.[13] Instead, we conclude that when an alien has filed a claim with the INS which is indefinite in nature and when that alien has the intention of remaining in this country and has significant ties to this country, then the alien is "permanently residing in the United States." An indefinite claim is one which has no definite ending either in time or purpose (as opposed to a student, temporary, visitor or business visa).

██ In this case claimant has filed an application for asylum. This application is indefinite in nature. Claimant intends to remain in the United States and has been in this country for approximately nine years. His wife and child are also present. Except for the time period in question, he has consistently worked both in Florida and Oregon. His INS status is similar to the status occupied by the pre-1980 temporary parolee. Additionally, because his asylum request was filed before an immigration judge, the request was also a request to withhold deportation. For this reason the INS cannot deport him without first finding that his life and freedom would not be threatened. These factors support the conclusion that during the relevant time periods, claimant was permanently residing in this country.

### III. *CONCLUSION*

So long as claimant meets the other Employment

---

[13] Although there may be some reason for the *Sudomir* analysis in the field of AFDC, the same rationale does not apply to unemployment claimants. Unlike the AFDC claimant, one who files for unemployment has worked and paid into an account with the expectation that insurance would be available if the need arose. Aliens cannot come to this country simply to receive unemployment benefits; they have to work in order to be eligible for benefits.

Division regulations he is entitled to unemployment compensation.

The Court of Appeals is reversed. The cause is remanded to the Employment Appeals Board for further proceedings not inconsistent with this opinion.