591 A.2d 605

CAROLINA BRAMBILA AND MARIO BRAMBILA, CLAIMANTS-APPELLANTS, v. BOARD OF REVIEW, NEW JERSEY DEPARTMENT OF LABOR AND INDUSTRY, RESPONDENT-RESPONDENT.

Argued January 28, 1991—Decided June 12, 1991.

*Keith G. Talbot,* Senior Attorney, and *Gilbert M. Garcia,* argued the cause for appellants (*Patricia Atkins,* Executive Director, Camden Regional Legal Services, Inc., attorney).

*Lewis A. Scheindlin,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Mary C. Jacobson,* Deputy Attorney General, of counsel).

*Margaret Stevenson,* argued the cause for *amicus curiae,* Legal Services of New Jersey (*Melville D. Miller, Jr.,* attorney).

The opinion of the Court was delivered by

STEIN, J.

Under the provisions of the Immigration Reform and Control Act (IRCA), two classes of aliens became eligible for permanent-resident status: "special agricultural workers", 8 *U.S.C.A.* § 1160 (SAWs), and "certain entrants before January 1, 1982," *id.* § 1255a (pre–1982 entrants). The question presented by this appeal is whether SAWs' or pre–1982 entrants' employment after IRCA's effective date (November 6, 1986) can be included in the calculation of their eligibility for state unemployment-insurance benefits. The United States Department of Labor (DOL) determined administratively that although such aliens may include post-IRCA employment for purposes of unemployment-insurance eligibility, they cannot do so until they have received temporary-resident status from the Immigration and Naturalization Service (INS); on receiving that status, post-IRCA employment retroactively becomes eligible for calculation of unemployment benefits. The Board of Review, New Jersey Department of Labor and Industry (Board) has adopted the United States Department of Labor's approach. Pursuant to that approach the Board denied the claims for unemployment benefits filed by claimants, Carolina and Mario Brambila. The Appellate Division affirmed. 241 *N.J.Super.* 216, 574 *A.*2d 992 (1990). The effect of those rulings is to defer substantially the

eligibility for unemployment benefits of a large class of aliens who will eventually receive their unemployment benefits when INS processes and approves their applications for temporary-resident status in the course of legalization proceedings. We granted certification on claimants' petition, 122 *N.J.* 376, 585 *A.*2d 381 (1990), and now reverse.

I

Claimants are aliens who have applied to INS for permanent-resident status pursuant to IRCA. IRCA established a three-step legalization process for two categories of illegal aliens, SAWs and pre–1982 entrants. SAWs are those aliens who have resided in the United States and performed seasonal agricultural services for at least ninety "man-days" in the twelve-month period between May 1, 1985, and May 1, 1986. *Id.* § 1160(a)(1)(B). Pre–1982 entrants are those aliens who entered the United States prior to January 1, 1982, and maintained continual unlawful residence until the date they filed an application for legalization under IRCA. *Id.* § 1255a(a)(2)(A).

INS first determines whether an application is nonfrivolous, and if so, accepts the application and grants the applicant work authorization. Work authorization ensures that employers are not subject to prosecution and that the worker can seek employment without fear of deportation. Next, in a process that can take up to four years, INS evaluates the application and either grants or denies temporary-resident status. After a further waiting period, the alien becomes eligible to apply for permanent-resident status. The vast majority of both SAW and pre–1982 applicants have been successful in attaining temporary-resident status. According to INS, 82% of New Jersey SAW applicants and 94% of New Jersey pre–1982 applicants for temporary-resident status have been approved. INS, Legalization Application Processing System and Statistics Division, Table 2 (Dec. 23, 1990) (INS Statistics).

Carolina Brambila entered the United States in 1973, and worked sporadically as a SAW until late 1987. She applied to INS for legalization under IRCA on January 26, 1988, and having presented a nonfrivolous application, was granted work authorization three days later. On November 29, 1987, two months prior to her legalization application, Brambila had filed a claim for unemployment benefits.

Among the eligibility requirements for unemployment benefits in New Jersey is the requirement that a claimant have worked a certain number of weeks and have earned a statutorily-fixed amount over the course of the claimant's "base year." See *N.J.S.A.* 43:21–4(e). That base year consists of the first four of the last five completed calendar quarters before the claimant files for unemployment benefits. See *N.J.S.A.* 43:21–19(c). For example, if an unemployed worker filed a claim during the second quarter of 1991, the base year for that claim would be January 1, 1990, through December 31, 1990. Earning adequate wages during the base year does not guarantee eligibility for benefits. If the claimant is not a United States citizen, the State will not credit wages earned during the base year unless the claimant, at the time the wages are earned, falls within one of three statutory exceptions: the alien must be either "lawfully admitted for permanent residence"; "lawfully present for the purpose of performing the services" (lawfully present); or "permanently residing in the United States under color of law" (PRUCOL), at the time the wages were earned. *N.J.S.A.* 43:21–4(i)(1).[1]

Thus, for unemployment-compensation purposes, Carolina Brambila's base year was July 1, 1986, through June 30, 1987, a time period that preceded both her application for legalization and her receipt of work authorization.

---

[1]The State acknowledges that there are three categories, although the statute contains the word "and" between the phrases "lawfully admitted for permanent residence" and "lawfully present for the purpose of performing the services."

The other claimant, Mario Brambila, entered the United States in June 1985 and worked thereafter as a SAW. He applied for legalization under IRCA on October 19, 1987, and INS granted work authorization four days later. He filed for unemployment benefits on January 3, 1988. Consequently, his base year was October 1, 1986, through September 30, 1987.

In February 1988 the Bridgeton Unemployment Office denied both Carolina and Mario Brambila's unemployment benefit claims on the ground that they had not been authorized to work during their base years. The Appeal Tribunal reversed both decisions. It concluded that because the claimants were entitled and intended to seek permanent-resident status under IRCA, claimants were PRUCOL as of IRCA's effective date. Consequently, their time worked and wages earned subsequent to November 6, 1986 (IRCA's effective date), could be used to establish a claim for benefits. A year later, and after the claimants had received their unemployment benefits, the Board of Review reversed the Appeal Tribunal, concluding that the Tribunal's interpretation of PRUCOL was overly broad. Relying on a DOL Program Letter, the Board determined that although wages earned subsequent to the effective date of IRCA but prior to receipt of work authorization could be included in an applicant's base-year-credit calculation, a claimant could include such wages retroactively in calculating a claim for benefits only after receiving temporary-resident status. Because INS had not yet granted the claimants temporary-resident status, the Board denied benefits.

The Appellate Division affirmed the Board's decision, finding a substantial credible basis in the record for the Board's determination, and observing that its decision was consistent with the administrative decision of DOL, "under·whose supervision the unemployment compensation program is conducted." 241 *N.J.Super.* at 221, 574 *A.*2d 992. Counsel for Mario Brambila has informed the Court that he was granted temporary-resident status on October 30, 1990. Consequently, pursuant to the Board of Review's decision, he is now entitled to receive credit

for time worked and wages earned subsequent to IRCA's effective date. His appeal is therefore moot. Carolina Brambila is still awaiting INS determination on her temporary-residence application.

## II

New Jersey's eligibility requirements for unemployment benefits derive from the Federal Unemployment Tax Act, 26 *U.S. C.A.* §§ 3301–3311 (FUTA). By providing grants to the State to cover administrative costs and tax credits to employers, the federal government creates incentives for the State to comply with FUTA's eligibility standards and thereby to be "certified" by the United States Secretary of Labor. 26 *U.S.C.A.* § 3302; 42 *U.S.C.A.* § 502. To be "certified," a state program can neither deny benefits on bases more stringent than those set forth in FUTA nor can it grant benefits more broadly than would FUTA. *See Ibarra v. Texas Employment Comm'n,* 823 *F.*2d 873, 874 (5th Cir.1987). Consequently, the eligibility requirements of New Jersey's statute mirror those of FUTA.

In 1936 the New Jersey Legislature enacted the Unemployment Compensation Law, *L.* 1936, *c.* 270, (codified at *N.J.S.A.* 43:21–1 to 43:21–24.19) (Act), in response to its concern that "economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state." *N.J.S.A.* 43:21–2. The Act provides security against the economic hazards of "involuntary unemployment" by "encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment." *Ibid.* Unemployment benefits must be paid "when due," 42 *U.S.C.A.* § 503(a)(1), ensuring that benefits are in "the pocket of the unemployed worker at the earliest point that is administratively feasible." *California Dep't of Human Resources Dev. v. Java,* 402 *U.S.* 121, 135, 91 *S.Ct.* 1347, 1356, 28 *L.Ed.*2d 666, 676 (1971).

As noted, both FUTA and the Act prohibit wages from being credited toward an alien claimant's base year unless at the time the work was performed that claimant was either (1) lawfully admitted for permanent residence; (2) lawfully present for purposes of performing the services; or (3) permanently residing under color of law. 26 *U.S.C.A.* § 3304(a)(14)(A); *N.J.S.A.* 43:21–4(i)(1). The first category is obviously inapplicable here because claimant Carolina Brambila has not yet been granted permanent-resident status, and we need not address the third category (PRUCOL), with respect to which DOL's administrative position is quite restrictive. *See* DOL Unemployment Insurance Program Letter (UIPL) No. 1–86, Change 1 (Feb. 16, 1989) (unpublished). We focus instead on the "lawfully-present" exception.

The lawfully-present test is seemingly straightforward. A worker is considered lawfully present for work in the United States if he or she has work authorization, regardless of the person's immigration status. DOL UIPL No. 12–87, Change 1, *reprinted in* 54 *Fed.Reg.* 10113 (1988) ("benefits based on wages from otherwise covered services performed while an alien * * * [has] work authorization * * * may be paid * * * because the services were performed while the alien was lawfully present for purposes of performing services"); *see Bushehri v. Industrial Claim Appeal Office,* 749 *P.*2d 439 (Colo. Ct.App.1987) (alien who had work authorization met lawful-presence test).

A closer examination of IRCA is required in order to assess claimant's assertion that the protections afforded her by that statute include lawfully-present status. The enactment of IRCA in 1986 signalled a Congressional attempt to address several immigration-related problems. *See generally* Lungren, *The Immigration Reform and Control Act of 1986,* 24 *San Diego L.Rev.* 277 (1987) (discussing legislative background and major provisions of IRCA). On one hand, Congress sought to stem the flow of illegal aliens into the United States by imposing for the first time sanctions on employers who knowingly

hire or recruit undocumented workers or refer them for jobs. *Id.* at 291. Of those aliens already residing in the United States, however, Congress permitted two groups to take part in a one-time amnesty program. The Congressional objective for including pre–1982 entrants was stated clearly:

> The United States has a large undocumented alien population living and working within its borders. Many of these people have been here for a number of years and have become a part of their communities. Many have strong family ties here which include U.S. citizens and lawful residents. They have built social networks in this country. They have contributed to the United States in myriad ways, including providing their talents, labor and tax dollars. However, because of their undocumented status, these people live in fear, afraid to seek help when their rights are violated, when they are victimized by criminals, employers or landlords or when they become ill.
>
> * * * [T]he alternative of intensifying interior enforcement or attempting mass deportation would be both costly, ineffective, and inconsistent with our immigrant heritage.
>
> [H.R.Rep. No. 99–682(I), 99th Cong., 2d Sess. 49, *reprinted in* 1986 *U.S.Code Cong. & Admin.News* 5649, 5653.]

Congress' inclusion of SAWs in IRCA's amnesty program stemmed, in part, from the nation's need for an adequate agricultural workforce. As noted by then-Deputy Secretary of Agriculture John R. Norton, III, in his testimony before the Subcommittee on Immigration, Refugees, and International Law:

> As we move toward implementation of employer sanctions, we must at the same time prevent labor shortfalls and dislocations which have the potential to disrupt harvests and interfere with marketing process[es]. The national economy and the American consumer depend upon a stable and adequate supply of agricultural labor to maintain commodity supplies at reasonable price levels. * * * [F]ailure to provide access to a legal work force will result in loss of production of some crops, loss of sales to other countries, further damage to our balance of payments, higher prices for American consumers and loss of American jobs in supporting activities such as packing, hauling, refrigeration, marketing, and other related industries. [*Id.* at 83, *reprinted in* 1986 *U.S.Code Cong. & Admin.News* at 5687.]

Congress was also mindful that prior immigration laws that had exempted farmworkers from state and federal wage, working condition, and labor laws had led to a system of "indentured slavery where employer exploitation was rampant and inhumane." *Ibid.* (quoting testimony of representative of Western

*Growers Ass'n)*. Accordingly, as the Judiciary Committee observed,

the most effective way to respond to * * * concerns regarding the availability of labor and at the same time to protect workers to the fullest extent of all applicable federal, state and local laws is to provide workers with * * * a status that ensures that their employment is fully governed by all relevant law without exception. [*Id.* at 84, *reprinted in* 1986 *U.S.Code Cong. & Admin. News* at 5688.]

Although IRCA became effective on November 6, 1986, aliens eligible to apply for temporary- and eventually permanent-resident status could neither obtain nor file applications for up to six months after IRCA's effective date. 8 *U.S.C.A.* § 1160(a)(1)(A); *id.* § 1255a(a)(1)(A). By postponing the start of the application period, Congress enabled INS to prepare the required application forms and procedures. DOL UIPL 12–87, *supra,* Change 1 at 3, *reprinted in* 54 *Fed.Reg.* at 10114 ("INS could have accepted applications for, and granted[,] lawful temporary resident status[ ] as early as November 6, 1986, if it had been able to set up its application process by that date"). Despite the fact that eligible aliens could not submit an application and thereby initiate IRCA's three-step legalization process during IRCA's first six months, Congress clearly conferred on such aliens significant rights during that interim period. First, any alien apprehended by INS after IRCA's effective date who could present a nonfrivolous claim to eligibility for legalization under IRCA could not be deported and had to be granted work authorization. 8 *U.S.C.A.* § 1160(d)(1); *id.* § 1255a(e)(1). In addition, after IRCA's effective date, and throughout the application period, employers could retain or hire aliens eligible to apply for legalization under IRCA without fear of prosecution. *Catholic Social Servs. v. Meese,* 664 *F.Supp.* 1378, 1380 (E.D. Cal.1987); *Castillo v. Jackson,* 207 *Ill.App.*3d 799, 806–07, 566 *N.E.*2d 404, 409–10 (1990).

A settlement in a nationwide class-action suit addressed the fact that thousands of aliens otherwise eligible for work authorization as of IRCA's effective date could not obtain such documentation during IRCA's first six months. See *Catholic*

*Social Servs. v. Meese, supra,* 664 *F.Supp.* 1378.[2] By settlement agreement entered into March 23, 1987, INS agreed to inform employers by way of an amended brochure that they could self-certify SAWs and pre–1982 entrants by asking them whether they qualified for legalization under IRCA and whether they intended to apply for legalization and work permits. If the worker answered both questions affirmatively, the alien was authorized to work and the employer was entitled, until September 1, 1987, to hire the alien without fear of penalty. *Ibid.;* 52 *Fed.Reg.* 16205 (1987).

Since the *Catholic Social Services* settlement, several tribunals have considered the question facing this Court, namely, whether aliens eligible for work authorization but unable to obtain documentation of that authorization can be considered lawfully present for unemployment-benefits purposes from IRCA's effective date. In *In re Lozano,* Precedent Benefit Decision No. P–B–460 (Cal. Unemployment Ins. Appeals Bd., Mar. 15, 1988), an alien in the process of legalizing under IRCA's pre–1982 entrant classification filed for unemployment benefits. The claimant had received work authorization on May 14, 1987, and five days later filed for unemployment benefits. Consequently, the claimant's base year was the calendar year 1986. Despite the fact that the claimant did not receive documentation of work authorization until after his base year, the Appeals Tribunal determined that the claimant was authorized to work and therefore "lawfully present" from IRCA's effective date.

The Tribunal reasoned that

---

[2]The *Catholic Social Services* class included:
All persons who * * * may be apprehended and * * * may be deported or issued voluntary departure by defendant [INS] * * * who are believed by defendant to be deportable aliens who can establish a prima facie claim for adjustment of status to temporary resident under [the SAW and pre–1982 entrant sections of IRCA]. [52 *Fed.Reg.* 11567 (1987).]

[a]s of November 6, 1986, the effective date of IRCA, the claimant was eligible to change his status had INS been able to implement IRCA. Also, the claimant's employer was not subject to prosecution for employing the claimant as of that date. Further, the claimant was work-authorized as of that date had he been apprehended by the INS. [*Id.* at 7.]

Accordingly, the Tribunal determined that all wages earned subsequent to November 6, 1986, qualified toward claimants base-period wage requirements. *Ibid.; see also In re Encalada*, Appeal No. 88–06482–10–05118 (Tex.Employment Comm'n, Aug. 4, 1988) (legalization applicant authorized by IRCA to work as of November 6, 1986, and therefore lawfully present as of same date); [3] *cf. Manrique v. Washington State Employment Sec. Dep't*, No. 86–2–02355–8 (Wash.Sup.Ct.1988) (consent order permitting aliens to self-certify work authorization from IRCA's effective date to September 1, 1987). Similarly, Oregon's Employment Division has concluded that wages earned subsequent to November 6, 1986, qualify toward an alien's base-period requirement as long as the alien is otherwise eligible to receive unemployment benefits. Priv.Ltr.Rul., Oregon Dep't of Justice (July 15, 1988).

DOL also recognizes that wages earned subsequent to IRCA's effective date by aliens eligible to apply under IRCA should be credited to the alien's base year for unemployment benefit purposes. UIPL 12–87, Change 1 states:

[A]lthough [IRCA was] effective November 6, 1986, INS did not start accepting applications for lawful temporary resident status until May 5, 1987. INS could have accepted applications for, and granted[,] lawful temporary status[ ] as early as November 6, 1986, if it had been able to set up its application process by that time. [DOL], therefore, has modified its interpretation of Section 3304(a)(14) to permit States, if State law so allows, to pay benefits based on wages from otherwise covered services performed on or after November 6,

---

[3]Although the decision says Encalada was granted "amnesty," it is clear from the processing time involved (he was allegedly granted "amnesty" on the same day he filed his application) that the agency meant he was granted work authorization and that the INS accepted his legalization application for determination.

1986. [DOL UIPL 12–87, *supra,* Change 1 at 3, *reprinted in* 54 *Fed.Reg.* at 10114.]

However, DOL includes an important limitation, stating:

The retroactive use of an alien's wages to November 6, 1986, is permitted only if the alien is *granted* lawful temporary resident status. [*Ibid.*]

Consequently, although DOL has determined that work performed by SAWs and pre–1982 entrants after IRCA's effective date can be credited toward the alien's base-period wage requirement, the agency has decided that the credit is not effective until INS has granted the alien temporary-resident status. The apparent rationale for that delay is to ensure that workers who are eventually denied temporary-resident status do not receive unemployment benefits.

## III

We now reach the question whether DOL and the Appellate Division correctly applied the lawfully-present test in the context of IRCA. That question implicates provisions of both FUTA and IRCA. We note that DOL, on whose Program Letter the Appellate Division relied, possesses administrative expertise in interpreting the provisions of FUTA, and IRCA's administration is largely the responsibility of INS. In any event, this Court is not bound by an agency's conclusions of law. *Mayflower Sec. Co. v. Bureau of Sec.,* 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973). We also observe that in denying claimant's application for unemployment benefits, neither the Board nor the Appellate Division addressed squarely claimant's argument that she was lawfully present as of IRCA's effective date and that therefore work performed after that date qualified toward her base-period-eligibility requirement.

In determining whether Brambila was lawfully present as of IRCA's effective date, we attach significance to the rights Congress conferred on eligible SAWs as of that date. Notably, claimant could have received work authorization immediately had INS been able to implement the application procedure. DOL UIPL 12–87, *supra,* Change 1 at 3, *reprinted in* 54

*Fed.Reg.* at 10114. Moreover, had claimant's employer helped claimant take advantage of the *Catholic Social Services* settlement by providing a self-certification form, claimant could have certified her own authorization to work. IRCA's effective date also marked the date after which Brambila's employer could not be prosecuted for employing her. *In re Lozano, supra,* slip op. at 7. Further, had INS apprehended claimant after November 6, 1986, she would have been non-deportable, 8 *U.S.C.A.* § 1160(d)(1)(A), and would have been granted work authorization. *Id.* § 1160(d)(1)(B).

Those protections, as well as the federal government's recognition that aliens in claimant's position were eligible for but unable to secure work authorization from November 6, 1986, through June 1, 1987, *see Catholic Social Servs. v. Meese, supra,* 664 *F.Supp.* 1378, demonstrate that claimants who could have presented nonfrivolous applications for legalization under IRCA were authorized to work as of IRCA's effective date. If so, the conclusion follows inescapably that claimants authorized to work are necessarily "lawfully present for purposes of performing the services" as of IRCA's effective date. *In re Lozano, supra,* slip op. at 6; *In re Encalada, supra,* slip op. at 3; *see also* DOL UIPL No. 12–87, *supra,* Change 1 at 2, *reprinted in* 54 *Fed.Reg.* 10113 ("benefits based on wages for otherwise covered services performed while an alien * * * [has] work authorization * * * may be paid * * * because the services were performed while the alien was lawfully present for purposes of performing services"). The record's silence on whether claimant self-certified her authorization to work pursuant to the *Catholic Social Services* settlement agreement does not preclude a finding that she was authorized to work. A claimant who worked lawfully during the period prior to the availability of INS legalization applications, and who has subsequently demonstrated eligibility for work authorization, should not be penalized because of an employer's failure to supply the self-certification work authorization form. *In re Lozano, supra,* slip op. at 10.

■ The Appellate Division implicitly reached the same conclusion when it determined that aliens in the process of legalizing under IRCA could credit their hours worked and wages earned after November 6, 1986, toward their base-period eligibility requirement. The court, however, relying on the 1988 DOL Program Letter, imposed an additional eligibility requirement not found in either FUTA or IRCA. The court adopted DOL's view that claimants who have fulfilled the eligibility requirements of FUTA and New Jersey's Unemployment Compensation Law are eligible to receive unemployment benefits only after INS has granted them temporary-resident status. 241 *N.J.Super.* at 221, 574 *A.*2d 992. The State, relying on DOL's Program Letter, argues that that delay is necessary to protect the unemployment-insurance fund from claimants who are subsequently found to be ineligible for temporary-resident status under IRCA and are therefore deportable. We disagree. In our view, that aspect of DOL's Program Letter is inconsistent with Congress' objectives in enacting IRCA, and we therefore hold that it is not binding on the State in its administration of the Act.

Although this Court has recognized that the goals of the New Jersey Unemployment Compensation Law are advanced by disallowing benefits in improper cases, *Krauss v. A & M Karagheusian*, 13 *N.J.* 447, 455–56, 100 *A.*2d 277 (1953), the threat of improper claims in this situation does not justify the substantial delay contemplated by the State's position. With approximately 2,000 applications still pending, approximately 82% of all New Jersey SAW applicants have been granted temporary-resident status. INS Statistics, Dec. 23, 1990. Because these figures include SAW applicants who presented frivolous claims and therefore did not receive work authorization, the percentage of successful applications for applicants like the Brambilas, who have already received work authorization, is even higher. Although the exact figures for applicants in the Brambilas' position are not available, unquestionably the vast majority will eventually attain temporary-resident status.

Moreover, unlike the situation with other government-benefit programs such as Aid to Families with Dependent Children (AFDC) and food stamps, eligibility for unemployment benefits is not based on financial need. Instead, unemployment benefits are a type of insurance available regardless of financial need to eligible individuals who have lawfully worked and earned the statutorily-prescribed amount during their base year. *See N.J. S.A.* 43:21–4. Thus, only individuals who have worked and contributed to the unemployment insurance fund are eligible for benefits. See *Gillar v. Employment Division,* 300 *Or.* 672, 717 *P.*2d 131, 140 n. 13 (1986) ("Unlike the AFDC claimant, one who files for unemployment has worked and paid into an account with the expectation that insurance would be available if the need arose. Aliens cannot come to this country simply to receive unemployment benefits; they have to work in order to be eligible for benefits."). That distinction is reflected in IRCA, which prohibits aliens from taking advantage of federal-benefits programs based on financial need for five years following the receipt of temporary-resident status. 8 *U.S.C.A.* § 1160(f); *id.* § 1255a(h)(1). No similar limitation exists concerning unemployment benefits, demonstrating Congress' recognition that to authorize certain aliens to perform jobs vital to the economy while denying them the right to collect unemployment benefits for which they are otherwise eligible by virtue of that authorization to work would be unfair and incongruous. There is no question that claimant has worked sufficient hours and paid sufficient unemployment taxes to be eligible for benefits. She is therefore entitled to receive unemployment benefits when they are most needed—at the time of involuntary unemployment.

We note the State's argument that a deviation from FUTA's eligibility requirements could lead DOL to "decertify" New Jersey's unemployment insurance program. See 26 *U.S.C.A.* § 3304(c). The difference between our conclusions and DOL's Program Letter, however, does not affect FUTA's requirement that an alien be "lawfully present" in the United States in order

to qualify for unemployment benefits. *See* 26 *U.S.C.A.* § 3304(a)(14)(A). We agree with DOL that an alien must have been lawfully present at the time base-period wages were earned in order to qualify for unemployment benefits. Nevertheless, we find no provision in FUTA or IRCA requiring that lawfully-present status should depend on receipt of temporary-resident status from INS, a process taking up to four years. Moreover, we find DOL's determination to be inconsistent with Congress' intent in enacting IRCA, specifically, to "allow qualified aliens to contribute openly to society and * * * to prevent the exploitation of this vulnerable population in the workplace." H.R.Rep. No. 99–682(I), 99th Cong., 2d Sess., *supra* 49, *reprinted in* 1986 *U.S.Code Cong. & Admin.News* at 5653. We note that tribunals in California, Texas, and Oregon have reached the same conclusion. Under the circumstances, decertification would be entirely inappropriate, and we have no doubt that the State's concerns are groundless.

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Opposed*—None.