VICTORINO CASTILLO, Plaintiff-Appellant, v. SALLY JACKSON *et al.*, Defendants-Appellees.—ALBERTO JIMINEZ, Plaintiff-Appellant, v. SALLY JACKSON *et al.*, Defendants-Appellees.

First District (6th Division)   Nos. 1—89—2952, 1—89—2954 cons.

Opinion filed December 21, 1990.

Legal Assistance Foundation, of Chicago (Jeffrey B. Gilbert, Barbara A. Kahn, and Susan Wishnick, of counsel), for appellants.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Jennifer A. Keller, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE RAKOWSKI delivered the opinion of the court:

Plaintiffs' cases, consolidated for review, were brought separately in the circuit court of Cook County as complaints for administrative review. Each plaintiff sought reversal of a final administrative decision of the Board of Review of the Illinois Department of Employment Security (IDES). The trial judge affirmed the decisions of the Board of Review which found plaintiffs ineligible for employment insurance benefits. Plaintiffs request that this court reverse the circuit court's judgment.

The issue this case presents is whether plaintiffs, who applied for and established *prima facie* cases of entitlement to amnesty pursuant to the Immigration Reform and Control Act of 1986 (IRCA) (8 U.S.C. §1255a (1986)), were "permanently residing in the United States under color of law" as of November 6, 1986 (IRCA's effective date), within the meaning of the Illinois Unemployment Insurance Act (the Act) (Ill. Rev. Stat. 1987, ch. 48, par. 444).

Victorino Castillo, plaintiff in case number 1—89—2952, is a Mexican citizen who entered the United States illegally in 1972. Castillo was employed as a factory worker since that time, until being laid off in January of 1988. On June 23, 1987, Castillo applied for amnesty under IRCA. At this time, Castillo received authorization from the Immigration and Naturalization Service (INS) to work in the United States. On February 1, 1988, Castillo applied for unemployment benefits.

To be eligible for unemployment insurance, a claimant must have been paid sufficient wages within his "base period." The base period in Illinois consists of the first four of the last five completed calendar quarters prior to the first day of the week in which the claimant files his claim. (Ill. Rev. Stat. 1987, ch. 48, pars. 347, 352.) Castillo's base period thus ran from October 1, 1986, through September 30, 1987. If all of the wages Castillo had earned during his base period had been counted toward his financial eligibility, Castillo would have been eligible for benefits. However, IDES did not count the wages Castillo had earned prior to June 23, 1987, the date he applied for amnesty. The Board of Review held that prior to June 23, 1987, Castillo had been working illegally and that his application for amnesty did not give color of law to Castillo's preapplication wages.

Alberto Jimenez, plaintiff in case number 1—89—2954, is a Cuban citizen, who entered this country in 1980 on a tourist visa and has remained here continuously since the expiration of the tourist visa. He became employed as an assembler in 1980. On October 28, 1987, Jimenez applied for amnesty under IRCA, and received formal work au-

thorization from INS on February 1, 1988. On March 15, 1988, Jimenez's employer laid him off, and Jimenez applied for unemployment benefits in the same month. Jimenez's base period ran from October 1, 1986, through September 30, 1987.

IDES also denied Jimenez's benefits. Jimenez was denied benefits because he applied for amnesty on a date after his base period expired, and IDES did not consider Jimenez to be residing in this country under color of law until the date of his application for amnesty. Like Castillo, if Jimenez's wages earned after IRCA's effective date were used as wage credits, Jimenez would have been eligible for unemployment benefits.

■ The facts in this case are not in dispute, and this court is not bound by the Board's determination of questions of law. The legal effect of undisputed facts is such a legal question. (*Barron v. Ward* (1987), 165 Ill. App. 3d 653, 659, 517 N.E.2d 591.) Courts must, however, give substantial weight and deference to the interpretation placed on a statute by the agency charged with its administration and enforcement. *Airey v. Department of Revenue* (1987), 116 Ill. 2d 528, 536, 508 N.E.2d 1058.

■ The Act was enacted to "lighten [the] burden which now so often falls with crushing force upon the unemployed worker and his family." (Ill. Rev. Stat. 1987, ch. 48, par. 300.) The Act is to be liberally construed in order to effectuate the legislature's public policy of protecting against the severe economic consequences which result from involuntary unemployment. (*Lipman v. Board of Review of Department of Labor* (1984), 123 Ill. App. 3d 176, 179, 462 N.E.2d 798.) The eligibility of nonresident aliens for benefits is provided for in section 614 of the Act, which provides that "[a]n alien shall be ineligible for benefits *** on the basis of wages for services performed by such alien, unless the alien is an individual who has been lawfully admitted for permanent residence or otherwise is permanently residing in the United States under color of law." (Ill. Rev. Stat. 1987, ch. 48, par. 444.) The color of law provision of the Act is an adoption of an alien eligibility category found in the Federal Unemployment Tax Act (FUTA) (26 U.S.C. §3301 *et seq.*, §3304(a)(14)(A) (1986)). Because unemployment insurance is a cooperative Federal-State program, Federal decisions are persuasive in resolving the issue that confronts us.

■ In *Holley v. Lavine* (2d Cir. 1977), 553 F.2d 845, *cert. denied sub nom. Shang v. Holley* (1978), 435 U.S. 947, 55 L. Ed. 2d 545, 98 S. Ct. 1532, the court shed some light on the phrase "under color of law." In *Holley*, the Second Circuit held that an otherwise deportable alien, who had moved to the United States as a child and bore six

children who are United States citizens, qualified as a person residing in the United States under color of law. (*Holley*, 553 F.2d at 849.) The determinative factor in the court's reasoning was a "formal letter" an INS official wrote to the plaintiff stating that " 'deportation proceedings have not been instituted ... for humanitarian reasons' " and that the " 'Service does not contemplate enforcing her departure from the United States at this time.' " (*Holley*, 553 F.2d at 849.) The court specifically limited its holding to the case where the plaintiff lived in this country with the knowledge or permission of the INS. (*Holley*, 553 F.2d at 849.) The plaintiff in *Holley* was a claimant for Aid to Families with Dependent Children (AFDC) benefits. In affirming the Board's decision, the trial judge in this case specifically noted that plaintiffs in this case did not come within the parameters of *Holley*, because, unlike *Holley*, the INS had no knowledge of the plaintiffs' presence at the time the wages at issue were earned.

The *Holley* court provided an insightful discussion of the phrase "under color of law." The court stated:

"The phrase obviously includes actions not covered by specific authorizations of law. It embraces not only situations within the body of the law, but also others enfolded by a colorable imitation. 'Under color of law' means that which an official does by virtue of power, as well as what he does by virtue of right. The phrase encircles the law, its shadows, and its penumbra. When an administrative agency or a legislative body uses the phrase 'under color of law' it deliberately sanctions the inclusion of cases that are, in strict terms, outside the law but are near the border.

There is no more common instance of action 'under color of law' than the determination of an official charged with enforcement of the law that he, as a matter of public policy, will exercise his discretion not to enforce the letter of a statute or regulation because such enforcement would involve consequences, or inflict suffering, beyond what the authors of the law contemplated. The discretionary refusal of a prosecutor or like administrator of the law to use his enforcement powers is often not supported by specific language in a statute or other charter of authority. Yet there is a legion of adjudicated cases which recognize that the prosecutor or like enforcing official may exercise a discretionary power, virtually unreviewable by a court, *not* to enforce a statutory command, and *not* to seek the imposition of penalties or other sanctions upon a known violator." (Emphasis in original.) *Holley*, 553 F.2d at 849-50.

The Second Circuit provided further discussion of the phrase in the case of *Berger v. Heckler* (2d Cir. 1985), 771 F.2d 1556. In *Berger*, the court observed "the phrase is designed to be adaptable and to be interpreted over time in accordance with experience, developments in the law, and the like. In this sense the phrase is organic and fluid, rather than prescriptive or formulaic." (*Berger*, 771 F.2d at 1571.) *Berger* involved the "permanently residing under color of law" language found in 42 U.S.C. section 1382c(a)(1)(B)(ii) regarding the eligibility of aliens for supplemental security income. *Berger*, 771 F.2d at 1558.

An examination of the cases which have construed the phrase "under color of law" with respect to aliens' eligibility for government assistance or government-operated benefit programs reveals several different scenarios where an alien has been held to be "under color of law." The first such scenario is that of the *Holley* case. In this situation, the INS has discretionally decided not to deport the alien and specifically informed the alien of this exercise of discretion. In such a situation, a fact-specific review of the alien's case has been made. One court has somewhat restrictively held that "the phrase makes eligible those aliens who, after review of their specific factual circumstances pursuant to a specific statutory or regulatory procedure, have been granted an immigration status which allows them to remain in the United States for an indefinite period of time." *Esparza v. Valdez* (D.C. Colo. 1985), 612 F. Supp. 241, 244.

Other courts, however, using the *Holley* decision as their starting point, have more broadly construed the phrase to encompass situations where the INS knows of an alien's presence and, by inaction, has conferred color of law status upon an alien. In *Lapre v. Department of Employment Security* (R.I. 1986), 513 A.2d 10, 12, for example, the court observed "it can be seen from *Holley* and those cases that follow it that INS has broad discretion in deportation cases and that exercise of that discretion in deportation cases can take many forms, including a formal letter that INS has no plans to deport a particular alien or instances in which the agency simply does nothing." In *Cruz v. Commissioner of Public Welfare* (1985), 395 Mass. 107, 115, 478 N.E.2d 1262, 1266, the court stated "the record and briefs suggest that during the relevant time the INS has been aware of plaintiff's continued residence and that it could have proceeded to deport her but has not done so *** the agency's inaction warrants the inference that the INS has acquiesced in the plaintiff's continued presence in this country." In *Antillon v. Department of Employment Security* (Utah 1984), 688 P.2d 455, 459, the court held "[a]t the time

he applied for unemployment benefits *** the INS knew he was in the United States *** knew where he was living *** and took no action to deport him or to act on his application for immigrant status. Antillon's residence was therefore under color of law." Also, in *Rubio v. Employment Division* (1984), 66 Or. App. 525, 529-30, 674 P.2d 1201, 1203, the court observed "[H]is residence was also under 'color of law' because INS knew of it and, by its routine regular extensions of his voluntary departure, had acquiesced in it. At the least INS exercised its discretion not to enforce the law; more accurately, it knowingly maintained the status quo pending outcome of claimant's application for permanent residence."

Where the INS has issued work authorization to an alien, numerous courts have found the alien to be present under color of law. (See *Arteaga v. Industrial Comm'n* (Colo. App. 1985), 703 P.2d 654; *Yatribi v. Industrial Comm'n* (Colo. App. 1985), 700 P.2d 929; *Vazquez v. Review Board* (Ind. App. 1985), 487 N.E.2d 171; but see *Zurmati v. McMahon* (1986), 180 Cal. App. 3d 164, 176, 225 Cal. Rptr. 374, 381.) The lack of work authorization during an alien's base period, however, has been held to be only one factor to consider in determining whether the alien is permanently residing under color of law. *Sandoval v. Colorado Division of Employment* (Colo. App. 1988), 757 P.2d 1105, 1108.

Plaintiffs contend that they were permanently residing in the United States under color of law at the time of their base periods as a result of the passage of IRCA, which became effective November 6, 1986. Plaintiffs' argument is as follows: Section 101(a)(3)(A) of IRCA contains a "grandfather clause" that provides that employer sanctions do not apply to aliens employed prior to the effective date. (8 U.S.C.A. §1324a (West Supp. 1987).) Thus, plaintiffs argue, they were lawfully employed after that date. Moreover, during the period of its passage until the expiration of the amnesty application period, IRCA prohibited the deportation of aliens who could make a *prima facie* showing of eligibility for amnesty and mandated that such aliens be granted authorization to work. (See 8 U.S.C. §1255a (1986).) Because plaintiffs were lawfully working as of November 6, 1986, were eligible for work authorization and were protected against deportation during the time, plaintiffs contend that they were clearly under color of law at the time the wages were earned. Such a result obtains, plaintiffs argue, particularly because of the elasticity of the concept of residing under color of law as applied to the singularly comprehensive reform IRCA represents.

IDES responds to plaintiffs' arguments by calling our attention to

a number of United States Department of Labor (DOL) pronouncements and IDES administrative rules and regulations—which support IDES' contention that plaintiffs cannot be considered permanently residing under color of law without specific knowledge of their presence at the time and some affirmative assurance by the government that they could remain in this country despite an illegal status. IDES further argues that IRCA only gave aliens such as plaintiffs the *opportunity* to seek legalization. IDES points out that an application must have been timely made, an applicant had to both satisfy eligibility requirements and establish continuous physical presence in the United States after IRCA's passage, and applicants who made a *prima facie* showing were only temporarily not subject to deportation and granted work authorization, until such time as their entitlement to status adjustment was determined. Thus, IDES concludes, plaintiffs cannot be considered either permanently residing in this country or under color of law as of the date of IRCA's passage.

There is a paucity of judicial or administrative decisions which have considered whether the passage of IRCA results in an alien's becoming permanently residing under color of law as of its effective date. In *Brambila v. Board of Review* (1990), 241 N.J. Super. 216, 574 A.2d 992, the claimants applied for unemployment benefits. The court upheld the New Jersey Board of Review's denial of benefits, holding that the claimants were not permanently residing under color of law at the time the agricultural work was performed. (IRCA also provides a mechanism whereby special agricultural workers can similarly apply for adjustment of status to that of an alien lawfully admitted for temporary residence. (See 8 U.S.C. §1160(a)(1)(B) (1986)).) In *Brambila*, the claimants had applied for temporary residence, but had received only employment authorization as of the date of their hearing. The court, relying on the deference accorded the Board's decision (which had relied on a DOL letter) and adopting the position that each State employment service should not separately interpret Federal immigration law, held that IRCA did not confer color of law status to the claimants as of its passage. *Brambila*, 241 N.J. Super. at 221, 574 A.2d at 995.

*In re: Barazas* (Or. Emp. Div. 1988), No. 88—P—843, an administrative decision, however, reaches a different result. In *Barazas*, the claimant was also an agricultural worker applying for adjustment of status under 8 U.S.C. section 1160. The *Barazas* decision held that because Congress granted individuals such as the claimant a special status as of the date of IRCA's enactment by providing protection from deportation and providing for work authorization even if the

claimant had become involuntarily known to the INS, the claimant was under- color of law at that time for the purpose of establishing authorization to be employed. *Barazas*, (Or. Emp. Div. 1988), No. 88—P—843, slip op. at 3.

IDES puts forth both United States Department of Labor Unemployment Insurance Letters (UIPLs) and its own regulations in support of its argument that plaintiffs were not permanently residing under color of law at the time of plaintiffs' base periods. Under these UIPLs and regulations, the IRCA amendments to the INA would have no effect on whether plaintiffs were permanently residing under color of law. Under these UIPLs and regulations, a claimant has that status only if the INS has affirmatively exercised its discretion against deportation and granted the alien permission in writing to reside in this country indefinitely. IDES acknowledged at oral argument, however, that in practice, it considers aliens such as plaintiffs to be permanently residing under color of law as of the date the aliens apply for amnesty.

■■ ■ The DOL pronouncements, however, are not binding on this court, as the deference accorded an agency's interpretation of a statute does not displace judicial analysis. (See *United States v. Cartwright* (1973), 411 U.S. 546, 550, 36 L. Ed. 2d 528, 533, 93 S. Ct. 1713, 1716.) Moreover, less deference is owed an agency's regulation which interprets only under general authority, as opposed to specific grant of authority. (*United States v. Vogel Fertilizer Co.* (1982), 455 U.S. 16, 24, 70 L. Ed. 2d 792, 800, 102 S. Ct. 821, 827.) Here, the DOL was not specifically authorized by Congress to interpret the phrase. Moreover, a regulation which is fundamentally at odds with congressional design will not be sustained. (*Vogel Fertilizer Co.*, 455 U.S. at 26, 70 L. Ed. 2d at 801, 102 S. Ct. at 828.) IDES's interpretation of the phrase is not binding on this court either, as this court has authority to construe a statute contrary to the construction placed on the statute by the agency. See *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n* (1983), 95 Ill. 2d 142, 153-54, 447 N.E.2d 293; *P.H. Mallen Co. v. Department of Finance* (1939), 372 Ill. 598, 601, 25 N.E.2d 43.

■■ IDES further asserts that a finding that plaintiffs were permanently residing in this country under color of law is contrary to 8 U.S.C. section 1255a(h), which temporarily disqualifies aliens from receiving certain financial assistance. This section of the INA states that aliens who are in temporary lawful residence status shall not be considered to be permanently residing in the United States under color of law. This provision, however, refers only to the financial as-

sistance programs listed, and unemployment benefits are not listed. As such, this provision of the INA does not apply to plaintiffs in this case. See *Gillar v. Employment Division* (1986), 300 Or. 672, 685 n.13, 717 P.2d 131, 140 n.13.

A review of the case law and authority presented by the parties leads to the conclusion that plaintiffs were indeed permanently residing in this country under color of law as of IRCA's effective date. We start by affirming the proposition expressed in *Berger*, that the "under color of law" concept is designed to be adaptable and to be interpreted over time in accordance with experience, developments in the law and the like. As IDES acknowledges, Congress was motivated by concerns for undocumented aliens such as plaintiffs in enacting IRCA. Congress noted that legalization of qualified aliens such as plaintiffs "would allow qualified aliens to contribute openly to society and it would help to prevent the exploitation of this vulnerable population in the work place." H.R. 99—682, 99th Cong., 2d Sess. 49, *reprinted in* 1986 U.S. Code Cong. & Admin. News 5649, 5653.

Congress' commitment to aliens such as plaintiffs is demonstrated by the unique protections afforded them under IRCA. Legalization of a qualified alien under IRCA is mandatory. (8 U.S.C. §1255a(a) (1986).) Also, although the application period for filing for amnesty did not begin until some time after IRCA's effective date, aliens apprehended before the application period commenced and aliens apprehended during the first 11 months of the application period could not be deported, were to be granted authorization to engage in employment and were to be granted an "employment authorized" permit, provided they could establish a prima facie case of eligibility. (8 U.S.C. §1255a(e) (1986).) Moreover, IRCA provided that its amendment to the INA which made it unlawful to hire, recruit or refer unauthorized aliens does not apply to aliens, like plaintiffs, who were employed prior to IRCA's effective date. It is apparent that Congress intended to and did provide special protections to aliens such as the plaintiffs in this case.

To hold against the plaintiffs in this case would result in a somewhat anomalous result. An alien who was involuntarily apprehended by the INS on the day after IRCA's passage, being fully known to the INS, but who filed an application and established a *prima facie* case of eligibility, would be absolutely protected from deportation and authorized to work. Such an alien, under most of the case law, would be under color of law. Plaintiffs, however, not being apprehended by the INS, would not be under color of law. The apprehended alien, due merely to the fortuity of his apprehension, would in many factual sce-

narios qualify for benefits while plaintiffs would not. Such a result cannot have been intended by Congress.

■■ To be sure, as IDES notes, the pre-IRCA cases the parties bring to our attention construing the phrase at issue have all involved fact patterns where the alien's presence in this country was known to the relevant authorities prior to the disputed time period. IDES has not, however, brought to our attention a case which holds that the lack of such knowledge necessarily precludes a finding that an individual is under color of law. It is, moreover, important to note that the situations in *Holley* and the other cases the parties have brought to our attention involved an exercise of discretion which did or did not confer the status on the alien. For discretion to be exercised at all, the relevant authorities must have knowledge of the alien's presence. The *Holley* court, however, indicated that an official's exercise of discretion was only the most common instance of action under color of law. We find no authority for the proposition that INS knowledge of plaintiffs' presence is a prerequisite to finding that plaintiffs were under color of law.

■■ Nor do we agree that only INS may confer color of law status on aliens, as IDES urged at oral argument. This argument, again, assumes that an exercise of official discretion is the only manner in which an individual may achieve color of law status. It is Congress, after all, who is empowered by the Constitution "to establish an uniform Rule of Naturalization." (U.S. Const., art. I, §8.) INS is an agency which Congress has created to effectuate immigration and naturalization policy. IDES has not argued, nor could it argue, that INS would be free to disregard an express directive by Congress that an individual is under color of law. Nor would INS have been free to deport aliens such as plaintiffs, or to deny them work authorization, in the event the aliens became known to INS during the period between the IRCA's passage and the filing for amnesty. In short, there is no need for IDES to confer color of law status as this has already been accomplished by Congress in a manner that leaves IDES without discretion.

A close analysis of plaintiffs' situations in this case reveals them to be both outside the law and inside the law. Plaintiffs were outside the law in the respect that they were undocumented aliens not present in this country pursuant to any authoritative right: "illegal aliens" in the common parlance. Yet, plaintiffs were in another sense brought within the law with the passage of IRCA as a result of IRCA's initial protections and consequent legalization of plaintiffs. Plaintiffs were in the very class of aliens Congress sought to legitimize through IRCA, and IRCA

gave plaintiffs color of law status which remained unless and until plaintiffs should fail to take advantage of the opportunity or be found ineligible. The result obtains that those such as plaintiffs, who are not wholly within and protected by the law, are among those to whom the concept "under color of law" applies. The plaintiff in *Holley* was able to benefit from the concept, even though she was fully outside the law, because she benefitted from an exercise of discretion. Plaintiffs, both outside and inside the law as a result of congressional policy and action, should benefit from the concept as well. We are convinced that some legal protection, as plaintiffs had in this case during the relevant time period, and color of law status may co-exist.

Finally, IDES argues that because at the time plaintiffs earned the wages for the period at issue plaintiffs had received no determination of eligibility, and that even upon application, a further determination of eligibility for adjustment of status to that of permanent resident needed to be made, plaintiffs were not "permanently" residing, even if plaintiffs were under color of law. In support of this proposition, IDES relies on the case of *Sudomir v. McMahon* (9th Cir. 1985), 767 F.2d 1456. In *Sudomir*, plaintiffs, who were otherwise deportable applicants for political asylum, argued that they were eligible for AFDC benefits. Plaintiffs had been informed that they could remain in the United States until a final decision had been made on their applications, or until the INS decided otherwise. The court held that plaintiffs were not "permanently" residing, stating:

> "A residence is temporary when the alien's continued presence is solely dependant upon the possibility of having his application for asylum acted upon favorably. Aliens who have official authorization to remain indefinitely until their status changes reside permanently; asylum applicants who merely participate in a process that [merely] gives rise to the *possibility* of such an authorization reside temporarily." (Emphasis in original.) *Sudomir*, 767 F.2d at 1462.

The fact that plaintiffs, having made their *prima facie* showing, are considered only "temporary" lawful residents with temporary work authorization and protection does not compel the result that they were not permanently residing in this country. In fact, FUTA itself provides that parolees admitted to the United States only "temporarily" are deemed permanently residing under color of law. (See 26 U.S.C. §3304(a)(14)(A) (1986); 8 U.S.C. §1182(d)(5) (1986).) It is thus clear that whether an alien is residing in this country permanently or temporarily is determined by the nature and not simply the title of his immigration status.

The *Holley* court also discussed the word "permanently" with respect to the "permanently residing" portion of the phrase. The court viewed the phrase "with an eye to" 8 U.S.C. section 1101(a)(31) (1986), which provides: "The term 'permanent' means a relationship of continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with the law." The court concluded that the plaintiff was "permanently residing" in the United States even though "permitted to stay in the United States not necessarily forever, but only so long as *** a particular condition exists." *Holley*, 553 F.2d at 851.

■■ The *Berger* court indicated that an expansive approach should be taken in interpreting the "permanently residing" portion of the phrase. (*Berger*, 771 F.2d at 1571.) Another court has reasoned that "permanent" should be distinguished from how the words "temporary" and "temporarily" are used in the Immigration and Nationality Act. As these words are used in reference to tourists, business visitors, students and the like, the narrow view of the *Sudomir* court should be rejected. (See *Gillar*, 300 Or. at 683, 717 P.2d at 138.) The *Sudomir* case and its more narrow view of this portion of the phrase are distinguishable also on the grounds that *Sudomir* was not an unemployment benefits case, and the *Sudomir* plaintiffs were otherwise deportable. Here, plaintiffs resided in this country on a continual basis since their arrival over 10 years ago and have taken advantage of Congress' offer to seek legalization of their status in this country. Plaintiffs have made a *prima facie* showing of eligibility. The proper conclusion is that they were permanently residing in this country during the time at issue.

Accordingly, the judgment of the circuit court of Cook County is reversed and remanded.

Reversed and remanded.

LaPORTA, P.J., and EGAN, J., concur.