(No. 71412.—)

VICTORINO CASTILLO *et al.*, Appellees, v. SALLY JACKSON *et al.*, Appellants.

*Opinion filed May 21, 1992.*

Roland W. Burris, Attorney General, of Springfield (Robert J. Ruiz and Rosalyn B. Kaplan, Solicitors General, and Jennifer A. Keller, Assistant Attorney General, of Chicago, of counsel), for appellants.

Jeffrey B. Gilbert, Barbara Kahn and Susan Wishnick, of Chicago, for appellees.

Linda R. Yanez, Arturo Jauregui and Ricardo Meza, of Chicago, for *amicus curiae* Mexican American Legal Defense & Educational Fund.

JUSTICE CLARK delivered the opinion of the court:

Plaintiffs' cases, consolidated below, were brought in the circuit court of Cook County seeking review of a determination by the Illinois Department of Employment Security (the Department) that plaintiffs were ineligible to receive unemployment benefits. The circuit court confirmed the decisions of the Department. The appellate court reversed the circuit court's decision (207 Ill. App. 3d 799), and we granted the Department's petition for leave to appeal (134 Ill. 2d R. 317).

The question presented for our review is whether, under Illinois law, aliens who applied for legalization under the provisions of the Immigration Reform and Control Act of 1986 (IRCA) (8 U.S.C. §1255a (1988)) were "permanently residing in the United States under color of law" (PRUCOL) as of IRCA's effective date. We answer this question in the affirmative and find that the plaintiffs were improperly denied unemployment insurance benefits by the Department.

## BACKGROUND

The Federal Unemployment Tax Act (FUTA) (26 U.S.C. §3301 *et seq.* (1988)) was enacted by Congress as part of a Federal-State system of unemployment insurance. Congress adopted FUTA in the wake of the Great Depression as part of the effort to address the needs of workers unemployed as a result of economic downturns. It chose to accomplish its ends by "encouraging" States to establish unemployment compensation systems.

FUTA levies an excise tax on "wages" paid by "employer[s]" in covered "employment." (26 U.S.C. §3301 (1988).) However, FUTA also provides each State a means by which to shelter its employers from the burden of the tax. If the State enacts an unemployment compensation program that conforms to Federal requirements, employers within that State obtain a tax credit of up to 90% against their basic FUTA liability. (26 U.S.C. §§3302, 3304(a) (1988).) In addition, conforming States are provided monies to defray the costs of administering their unemployment benefit programs. (42 U.S.C. §502 (1988).) The Secretary of Labor of the United States certifies conforming States on an annual basis. (26 U.S.C. §3304(c) (1988).) The Secretary of Labor is required to certify those States whose unemployment law complies with certain Federal statutory requirements. (26 U.S.C. §3304(c) (1988).) If a State is not certified, it may lose its Federal funds and its employers may lose their tax credits.

The Illinois Unemployment Insurance Act (the Act) (Ill. Rev. Stat. 1987, ch. 48, par. 300 *et seq.*) was passed by the General Assembly in response to FUTA. The purpose of the Act is to afford relief to those who are involuntarily unemployed and to ameliorate the economic insecurity incident to involuntary unemployment. (Ill. Rev. Stat. 1987, ch. 48, par. 300. See also Bernstein, *The Illinois Unemployment Insurance Act*, Ill. Ann. Stat., ch. 48, at XIII (Smith-Hurd 1986).) Under section 500E of the Act, a claimant must earn sufficient wages within his or her "base period" in order to qualify for benefits. (Ill. Rev. Stat. 1987, ch. 48, par. 420E.) The base period is the first four of the last five completed calendar quarters prior to the first day of the week in which a claimant files a claim. Ill. Rev. Stat. 1987, ch. 48, pars. 347, 352.

Certain classes of persons are precluded by the Act from receiving unemployment benefits regardless of

whether they meet the wage tests of section 500E. Section 614 of the Act (Ill. Rev. Stat. 1987, ch. 48, par. 444) limits unemployment benefits to alien residents and provides in part:

> "An alien shall be ineligible for benefits *** on the basis of wages for services performed by such alien, unless the alien is an individual who [1] has been lawfully admitted for permanent residence or [2] otherwise is permanently residing in the United States under color of law ***."

The language of section 614 is designed to keep Illinois within the certification requirements of FUTA. Section 3304(a) of FUTA states:

> "The Secretary of Labor shall approve any State law submitted to [her] *** which [she] finds provides that—
>
> * * *
>
> (14)(A) compensation shall not be payable on the basis of services performed by an alien unless such alien is an individual who [1] was lawfully admitted for permanent residence at the time such services were performed, [2] was lawfully present for purposes of performing such services, or [3] was permanently residing *** under color of law at the time such services were performed ***." 26 U.S.C. §3304(a) (1988).

As originally enacted, section 3304(a)(14)(A) of FUTA did not include the second category of eligible aliens, those "lawfully present for the purpose of performing services." This language was added by Congress to FUTA in 1977 principally to allow the States to pay benefits to certain Canadian and Mexican employees who legally worked in the United States but who chose not to reside here. (See Emergency Unemployment Compensation Extension Act of 1977, Pub. L. No. 95—19, §302(a), 91 Stat. 39, 44 (1977); S. Rep. No. 67, 95th Cong., 1st Sess., at 14 (1977), *reprinted in*, 1977 U.S.C.C.A.N. 271; Unemployment Insurance Program Letter No. 1—86 (Department of Labor, Employment and Training Ad-

ministration Oct. 28, 1985), 51 Fed. Reg. 29713, 29715 (1986).) Although the General Assembly passed section 614 of the Act after Congress amended section 3304(a)(14) of FUTA, the General Assembly did not include in the Act the second class of nonresident aliens recognized by Congress, those "lawfully present for purposes of performing services." The parties, therefore, agree that FUTA's "lawfully present for purposes of performing services" language does not control the present dispute, although plaintiffs in this case might have been entitled to benefits under this provision had the General Assembly adopted Congress' amending language. See Unemployment Insurance Program Letter No. 12—87, Change 1 (Department of Labor, Employment and Training Administration Sept. 28, 1988), 54 Fed. Reg. 10113, 10114 (1989) (aliens once granted lawful temporary resident status under IRCA are "lawfully present for purposes of performing services" and States may treat such status as retroactive to November 6, 1986); *Brambila v. Board of Review* (1991), 124 N.J. 425, 438, 591 A.2d 605, 612 (because Department of Labor regulations found inconsistent with intent of Congress as expressed by IRCA, aliens need only make *timely application* for amnesty in order to claim "lawfully present for purposes of performing services" status retroactive to November 6, 1986).

IRCA became law on November 6, 1986. IRCA implemented a comprehensive reform of United States immigration law in two ways. First, IRCA made it unlawful for employers to hire, recruit, refer, or continue to employ unauthorized aliens, and set out a comprehensive program of sanctions against employers who hired or failed to screen prospective employees. (8 U.S.C. §§1324a(a)(1), (a)(2) (1988).) With regard to these sanctions, however, IRCA allowed employers to retain or hire aliens eligible to apply for amnesty under IRCA

without fear of prosecution. 8 U.S.C. §§1324a, 1255a(a)(3)(A) (1988). See also *Brambila*, 124 N.J. at 434-35, 591 A.2d at 610 (discussing *Catholic Social Services v. Meese* (E.D. Cal. 1987), 664 F. Supp. 1378).

Second, IRCA provided a one-time opportunity to millions of undocumented aliens who already resided in the United States to obtain documented immigration status. IRCA's "legalization" or "amnesty" provisions were designed, in part, to allow qualified aliens who were longtime United States residents to enter the mainstream of American society. The IRCA legalization process, however, was not simple.

Prior to entering the formal process, an alien first presented himself to the Immigration and Naturalization Service (INS) during the one-year period beginning May 5, 1987, for an initial determination that his claim of amnesty was not frivolous. If the alien's claim passed this initial screening, INS granted "work authorization" to the applicant, which served to give notice to employers that they would not be subject to prosecution for employing the alien. (8 U.S.C. §1255a(e) (1988).) In addition, work authorization assured the alien that he may seek employment without fear of deportation. Next, INS formally evaluated the alien and granted or denied lawful "temporary resident" status based upon evidence presented by the alien relating to the requirements of IRCA. (8 U.S.C. §1255a(a) (1988).) This initial process could take as long as four years. (*Brambila v. Board of Review* (1991), 124 N.J. 425, 428, 591 A.2d 605, 607.) After a further waiting period of at least 18 months, the alien was required to apply for "permanent-resident status" which, if certain basic citizenship skills and other minor requirements were met, granted to the alien his so called "green card." 8 U.S.C. §1255a(b) (1988).

Unlike most other immigration provisions that give to the INS or the Attorney General broad discretionary

powers to determine whether an alien should be allowed to enter the United States, IRCA compelled the INS to treat *bona fide* IRCA applicants as being "lawfully admitted." (8 U.S.C. §1255a(a) (1988).) In addition, before and during the legalization window created by IRCA when certain aliens could apply for amnesty, IRCA prohibited the INS from deporting any alien who could "establish a prima facie case of eligibility" under IRCA's legalization scheme. 8 U.S.C. §§1255a(e)(1), (e)(2) (1988).

In addressing the issue presented to us, we note that neither Congress nor the General Assembly have defined PRUCOL. However, both the United States Department of Labor (Labor Department), the Federal agency responsible for certifying the States under FUTA, and the Department, the Illinois agency which administers the Act, have promulgated regulations giving specific meaning to the phrase. (See Unemployment Insurance Program Letter No. 1—86 (Department of Labor, Employment and Training Administration Oct. 28, 1985), 51 Fed. Reg. 29713 (1986) (PRUCOL requires INS to "affirmatively determine each alien's status in accordance with its authority and the alien's specific circumstances"); Unemployment Insurance Program Letter No. 1—86, Change 1 (Department of Labor, Employment and Training Administration Feb. 16, 1989) (unpublished) ("aliens do not become PRUCOL by applying for or intending to apply for, adjustment of status under the legalization programs established by IRCA"); 56 Ill. Adm. Code §2905.15 (1991) (Illinois Department of Employment Security) (PRUCOL status requires individual to "show that the [INS] has provided written notification that he may remain in the United States for an indefinite period of time").) Also, although our resolution of the issue involved in this case ultimately turns on our interpretation of PRUCOL as found in the Act, we note that we are construing language originally drafted by

Congress. Although Congress has not preempted the field of unemployment compensation law, the clear intention of the General Assembly in enacting section 614 of the Act was to bring State law into conformity with Federal requirements and, thereby, allow Illinois to maintain its FUTA-certified status. Therefore, Federal court decisions and Federal agency interpretations addressing the proper meaning of PRUCOL are persuasive in resolving the issue before us; Federal statutes which address PRUCOL are dispositive as a matter of State law.

## FACTS

Plaintiff Victorino Castillo illegally entered the United States from Mexico in 1972. Once here, he took employment performing general factory work. On June 23, 1987, Castillo applied for legalization under IRCA and was granted work authorization from the INS that same day. In January of 1988, Castillo was laid off and on February 1, 1988, he filed for unemployment benefits. Based upon the date Castillo applied for benefits, Castillo's base period was determined to run from October 1, 1986, through September 30, 1987.

On February 24, 1988, a claim adjudicator at the Department denied Castillo's application for benefits since wage credits paid by Castillo's employer related to Castillo's earnings "were not paid at a time when [Castillo] was authorized under Federal law and regulations to perform such work." In reviewing Castillo's case, the appellate court noted, "If all wages Castillo had earned during his base period had been counted toward his financial eligibility, Castillo would have been eligible for benefits. However, [the Department] did not count the wages Castillo had earned prior to June 23, 1987, the date he applied for amnesty." 207 Ill. App. 3d at 802.

Plaintiff Alberto Jimenez is a Cuban citizen who overstayed his tourist visa in 1980 and began working in the United States as an assembler. Jimenez applied for legalization under IRCA on October 28, 1987, and was granted authorization to work from the INS on February 1, 1988. On March 15, 1988, Jimenez was laid off and he applied for unemployment benefits the following day. Like Castillo, Jimenez's claim for unemployment benefits was also denied by the Department.

Because Jimenez applied for benefits the same calendar quarter as Castillo, Jimenez's base period was identical to Castillo's, running from October 1, 1986, through September 30, 1987. Although Jimenez had also earned sufficient wage credits during his base period to qualify for unemployment benefits, the Department denied his claim pursuant to section 614 of the Act. The Department based its decision on the fact that Jimenez had earned none of his credits while authorized to work by INS. As the appellate court noted, "Like Castillo, if Jimenez's wages earned after IRCA's effective date were used as wage credits, Jimenez would have been eligible for unemployment benefits." 207 Ill. App. 3d at 803.

## THE SUPREMACY CLAUSE

We begin our analysis with a discussion of whether it is State or Federal law that we are construing. The supremacy clause of the United States Constitution states, "the Laws of the United States *** shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby ***." (U.S. Const., art. VI, cl. 2.) In the present case PRUCOL is a term found both in the language of the Federal statute, FUTA, and in the State statute, the Act. Simply because Federal and State statutes use the same terms, however, does not mean that we are compelled under the supremacy clause to give them the same meaning. It is the power and *intent* of

Congress to preempt an area of law which triggers the requirements of the supremacy clause. With regard to cooperative "Federal-State" programs like Illinois' unemployment insurance program, Congress specifically decided *not* to preempt State law. Instead, Congress merely conditioned certain Federal benefits to Illinois based upon whether the State chooses to enact an unemployment program which conforms to Federal requirements. (See *Carmichael v. Southern Coal & Coke Co.* (1936), 301 U.S. 495, 525-27, 81 L. Ed. 1245, 1262-63, 57 S. Ct. 868, 880 (discussing interrelationship between Federal and State unemployment benefits law).) Simply put, the United States Constitution does not require Illinois to comply with FUTA.

This is not to say that the requirements of FUTA are not the law in Illinois. The General Assembly has decided that Illinois will participate in the Federal-State unemployment system. A condition of such participation is that Illinois comply with FUTA and receive a certificate from the Labor Department confirming this fact each year. As we have noted, the General Assembly has made its intention clear that Illinois retain its Labor Department certification. Section 616B of the Act states that the Department "shall cooperate, to the fullest extent consistent with the provisions of [the] Act, with the United States Secretary of Labor *** with respect to the provisions of *** [FUTA]." Ill. Rev. Stat. 1987, ch. 48, par. 616(B).

Because we find that the clear intention of the General Assembly is for Illinois to remain certified by the Labor Department, FUTA terminology which the General Assembly has incorporated into State law must be interpreted as *Congress* intended those terms to be used, but we again stress that this conclusion is compelled as a matter of State, not Federal, law. Although we may defer to Federal court decisions and agency interpretations

in our attempt to discern congressional intent (and in this case, therefore, the General Assembly's intent), the Federal Constitution is simply not implicated unless and until Congress chooses to preempt the field of law here at issue.

## IRCA SECTION 201(h)(1)

"The starting point in every case involving construction of a statute is the language itself." (*Blue Chip Stamps v. Manor Drug Stores* (1975), 421 U.S. 723, 756, 44 L. Ed. 2d 539, 561, 95 S. Ct. 1917, 1935 (Powell, J., concurring, joined by Stewart and Marshall, JJ.).) In section 201(h)(1) of IRCA Congress temporarily excluded amnesty claimants from receiving certain Federal and State "public welfare assistance." Section 201(h)(1) states:

"(h) Temporary disqualification of newly legalized aliens from receiving certain public welfare assistance

(1) In general

During the five-year period beginning on the date an alien was granted lawful temporary resident status *** and not withstanding any other provision of law ***

(A) *** the alien is not eligible for—

(i) any program of financial assistance furnished under Federal law *** on the basis of financial need, as such programs are identified by the Attorney General *** (but in any event including the program of aid to families with dependent children ***),

(ii) medical assistance under a State plan approved under title XIX of the Social Security Act [citation], and

(iii) assistance under the Food Stamp Act of 1977 [citation].
***

Unless otherwise specifically provided by this section or other law, an alien in temporary lawful residence status granted under [IRCA] shall not be considered (for pur-

poses of any law of a State or political subdivision providing for a program of financial assistance) to be permanently residing in the United States under color of law." 8 U.S.C. §1255a(h)(1) (1988).

Castillo and Jimenez argue that section 201(h)(1) confirms their PRUCOL status by inference. They argue as follows. Because unemployment benefits are furnished under a program conceived and partially administered by the Federal government, section 201(h)(1) addresses unemployment insurance as a "program of financial assistance furnished under Federal law," and not as a program of financial assistance provided by a "law of a State." Next, they note that neither Congress nor the Attorney General has designated the unemployment insurance program as one of the Federal programs in which aliens legalized under IRCA are precluded from participating. (See 20 C.F.R. §245a.5 (1991).) They argue that unlike those programs specifically denied to aliens by section 201(h)(1), unemployment benefits are not furnished "on the basis of financial need." In contrast to those programs listed either in section 201(h)(1) or by the Attorney General, unemployment benefits are paid from a program that works like private insurance. Eligible claimants receive payments regardless of income. Castillo and Jimenez make the argument that Congress included section 201(h)(1) in IRCA precisely because it realized that IRCA's passage conferred PRUCOL status upon aliens like them and that, without section 201(h)(1), IRCA-legalized aliens would be eligible to receive a wide host of generous government benefits which Congress meant to initially withhold, unemployment insurance benefits being a conspicuous exception.

We cannot agree with Castillo and Jimenez that section 201(h)(1) confirms their PRUCOL status. To be sure, the parties have treated unemployment as a "program of financial assistance furnished under Federal law." The

Department has specifically conceded that unemployment compensation benefits are not within the scope of section 201(h)(1). The Department has cited to section 201(h)(1) as "instructive only" in order to counter Castillo and Jimenez's argument that section 201(h) grants them PRUCOL status by inference. The Labor Department, too, has avoided relying upon section 201(h)(1) in its regulations which deny PRUCOL status to IRCA legalized aliens. Unemployment Insurance Program Letter No. 1—86, Change 1 (Department of Labor, Employment and Training Administration Feb. 16, 1989) (unpublished).

But even if the last paragraph of section 201(h)(1) does not preclude Castillo and Jimenez from claiming PRUCOL status for benefits like unemployment insurance, we note that the focus of section 201(h)(1) is on the period of time *after* an alien receives lawful temporary resident status, not the time prior to this period. Further, section 201(h)(1) prohibits aliens from receiving government benefits for five years. Because section 201(h)(1) operates to deprive legalized aliens from receiving benefits for a fixed period of time after lawful temporary resident status is granted, a potential effect of the statute is to deny benefits for a period of time even after an alien's status is adjusted to lawful permanent resident. We think the only intent Congress evidenced by enacting section 201(h)(1) was to restrict, rather than expand, the class of people who are eligible for government assistance. While unemployment benefits may not be denied to Castillo and Jimenez by operation of section 201(h)(1), we cannot agree that this section confirms their PRUCOL status.

## FEDERAL AND STATE REGULATIONS

As we have noted, both the Labor Department and the Department have promulgated regulations which in-

terpret PRUCOL. Three regulations are principally at issue.

In Unemployment Insurance Letter No. 1—86 (October 28, 1985), 51 Fed. Reg. 29713, the Labor Department stated that it would treat "parolees" and refugees as being PRUCOL, as well as those who "after a review of their *particular* circumstances under INS statutory or regulatory procedures have been granted a status which allows them to remain in the United States for an indefinite period of time." (Emphasis added.) However, Unemployment Insurance Program Letter No. 1—86 was promulgated well before the passage of IRCA. Therefore, we believe it can shed little light on whether IRCA-eligible aliens were PRUCOL after IRCA's effective date.

In contrast, in Unemployment Insurance Letter No. 1—86, Change 1 (Department of Labor, Employment and Training Administration Feb. 16, 1989) (unpublished), the Labor Department did address the question of whether aliens who apply for amnesty under IRCA become PRUCOL. The Labor Department here concluded that because there remains a possibility that an alien in the legalization process could be deported should he fail to meet IRCA's legalization requirements (see 8 U.S.C. §1255a(b) (1988)), IRCA legalized aliens may *never* receive benefits under PRUCOL status. The Labor Department took this position even though INS's own statistics show that over 92% of all aliens granted lawful temporary status under IRCA are successful in obtaining lawful permanent resident status. Provisional Legalization Application Statistics, United States Immigration and Naturalization Service (Statistics Division, Office of Plans and Analysis Dec. 23, 1990).

Finally, in apparent response to Unemployment Insurance Letter No. 1—86, Change 1, the Department amended its regulations, effective June 29, 1989, to pre-

clude an alien from claiming PRUCOL status unless "the individual or group or class member [can] show that the [INS] has provided written notification that he may remain in the United States for an indefinite period of time." 13 Ill. Reg. 11502, 11505-06 (1989).

Although we recognize that courts have given substantial weight to interpretations of statutes made by those agencies charged with their enforcement, an agency's interpretation of statutory language is not binding on the courts. (*Carson Pirie Scott & Co. v. State of Illinois Department of Employment Security* (1989), 131 Ill. 2d 23, 34.) The appellate court correctly noted that "the deference accorded an agency's interpretation of a statute does not displace judicial analysis." (207 Ill. App. 3d at 808; see *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.* (1984), 467 U.S. 837, 843 n.9, 81 L. Ed. 2d 694, 703 n.9, 104 S. Ct. 2778, 2781 n.9 (courts are "the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent").) Indeed, the Seventh Circuit has specifically held that Labor Department "letters may be relied on as agency interpretations of the statutes to which some deference may be accorded[;] however, ' "the courts have the reserve of power to substitute their own judgment on all questions of statutory interpretation." ' " *Cosby v. Ward* (7th Cir. 1988), 843 F.2d 967, 981 (quoting *Doe v. Reivitz* (7th Cir. 1987), 830 F.2d 1441, 1447, quoting 2 K. Davis, Administrative Law Treatise §7:11, at 55 (1979)).

We are, therefore, faced with the question of whether the Labor Department's Unemployment Insurance Regulation No. 1—86, Change 1, and the Department's parallel regulation, found at 13 Ill. Reg. 11502, 11505-06 (1989), comport with the proper meaning of PRUCOL as intended by Congress and, therefore, by the General Assembly.

## PRUCOL

Castillo and Jimenez would have received unemployment benefits had the Department recognized them as "permanently residing in the United States under color of law" as of November 6, 1986. Although PRUCOL has not been defined in either Federal or Illinois statute, the phrase has been considered by both State and Federal courts. In considering the proper meaning to be given PRUCOL, we address separately the "permanently residing in the United States" and the "under color of law" components of the PRUCOL requirement.

## PERMANENTLY RESIDING IN THE UNITED STATES

We agree with the appellate court that Castillo and Jimenez were "permanently residing in the United States" as of IRCA's effective date. In *Holley v. Lavine* (2d Cir. 1977), 553 F.2d 845, the United States Court of Appeals for the Second Circuit, in construing identical PRUCOL language found in the Aid to Families with Dependant Children program, concluded that an alien need not live here "forever" to be "permanently residing in the United States." The *Holley* court based its determination on Congress' definition of "permanent" as found in the Immigration and Nationality Act (Nationality Act), the statute which IRCA amended:

> " 'The term "permanent" means a relationship of continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with law.' " (*Holley*, 553 F.2d at 850, quoting 8 U.S.C. §1101(a)(31) (1988).)

In addition, the Nationality Act defines the term "residence" as "the place of general abode," which is the

"principal, actual dwelling place in fact, without regard to intent." (8 U.S.C. §1101(a)(33) (1988).) Finally, although the term "temporary" is not defined anywhere in the Nationality Act, the words "temporary" and "temporarily" are used in section 1101(a) of the Nationality Act in referring to students, tourists, business visitors and workers admitted for specific jobs. 8 U.S.C. §§1101(a)(15)(B), (a)(15)(F), (a)(15)(H), (a)(15)(J) (1988).

On the date at issue here, November 6, 1986, we believe Castillo and Jimenez fell more closely under the "permanent" than the "temporary" classes of residents described by Congress. As one court has stated, " 'The common characteristics of *** temporary relationships is that they exist for a *defined purpose* with a *defined end*, and there is never any intention of abandoning the country of origin as a home.' " (Emphasis in original.) (*Gillar v. Employment Division* (1986), 300 Or. 672, 682, 717 P.2d 131, 138, quoting *Sudomir v. McMahon* (9th Cir. 1985), 767 F.2d 1456, 1467 (Canby, J., dissenting).) On the date of IRCA's passage both plaintiffs were able to show that they had "continuously resided" in the United States from well before January 1, 1982, the date required by IRCA section 1255a(2)(a). Both men had United States addresses, held long-term employment here and paid taxes to both the State and Federal governments so as to have the required "relationship of continuing or lasting nature" with the United States. The record makes no indication that either man had a "principal, actual dwelling place" anywhere but in this country.

The Department makes much of the fact that IRCA adjusted the status of Jimenez and Castillo from that of being undocumented to that of being "lawfully admitted for *temporary* residence." (Emphasis added.) (8 U.S.C. §1255a(a) (1988).) The Department vigorously objects that an alien cannot be a "lawful temporary resident" of

the United States while, at the same time, be "permanently residing" here. We note, however, that FUTA section 3304(a)(14)(A) itself provides that "parolees" are permanently residing in the United States under color of law even though section 212(d)(5) of the Nationality Act states that such aliens are paroled into the United States "temporarily." (See 8 U.S.C. §1182(d)(5) (1988).) We agree with the appellate court that "whether an alien is residing in this country permanently or temporarily is determined by the nature and not simply the title of his immigration status." 207 Ill. App. 3d at 811.

In support of its position, the Department relies on *Sudomir v. McMahon* (9th Cir. 1985), 767 F.2d 1456, and *Esparza v. Valdez* (D. Colo. 1985), 612 F. Supp. 241, *aff'd* (10th Cir. 1988), 862 F.2d 788, both cases which denied PRUCOL status to aliens who had filed applications for asylum. However, both *Sudomir* and *Esparza* were cases decided prior to IRCA's enactment. As discussed below, Congress itself recognized IRCA-eligible aliens as a special class of aliens entitled to special statutory protections. (See 207 Ill. App. 3d at 809.) Castillo and Jimenez are, therefore, unlike the aliens before the court in either *Sudomir* or *Esparza* who were merely "tolerated during the period necessary to process their applications." *Sudomir*, 767 F.2d at 1462.

For these reasons we conclude that both Castillo and Jimenez resided here "permanently," at least from IRCA's effective date, November 6, 1986.

## UNDER COLOR OF LAW

In addition to "permanently residing in the United States," an alien who seeks PRUCOL status must live in the United States "under color of law." As we have noted, both the Labor Department and the Department have promulgated regulations which interpret PRUCOL in a way that limits the ability of amnesty-eligible aliens

such as Castillo or Jimenez to claim "under color of law" status for the purposes of receiving unemployment benefits.

Under both Department and Labor Department regulations, legalized aliens such as Castillo and Jimenez would not be eligible to begin accumulating unemployment wage credits until each had reached lawful permanent resident status. (Unemployment Insurance Program Letter No. 1—86, Change 1 (Department of Labor, Employment and Training Administration Feb. 16, 1989) (unpublished); 56 Ill. Adm. Code §2905.15 (1991) (Illinois Department of Employment Security).) Both agencies base their position on the fact that the Act does not include the "lawfully present for purposes of performing such services" language found in FUTA section 3304(a)(14)(A). Although both agencies are apparently willing to conclude that Castillo and Jimenez are "lawfully present for purposes of performing services," neither agency is willing to admit that Castillo and Jimenez are "permanently residing in the United States under color of law."

We believe that the PRUCOL language of our statute allows, and Federal court decisions require, a broader interpretation of "under color of law" than that offered by either the Labor Department or the Department. The United States Court of Appeals for the Second Circuit carefully considered the proper scope of the "under color of law" language in the Holley v. Lavine decision:

> "The phrase [under color of law] encircles the law, its shadows, and its penumbra. When an administrative agency or a legislative body uses the phrase 'under color of law' it deliberately sanctions the inclusion of cases that are, in strict terms, outside the law but are near the border." (Holley, 553 F.2d at 849-50.)

Subsequently, the Second Circuit added:

"The scope of [PRUCOL] \*\*\* is not clear from the language employed. Instead, the phrase is designed to be adaptable and to be interpreted over time in accordance with experience, developments in the law, and the like. In this sense the phrase is organic and fluid, rather than prescriptive or formulaic.

We agree wholeheartedly with the \*\*\* characterization of [PRUCOL] as 'both expansive and elastic.' As [has been] observed, 'On its face, by its reference to "under color of law," the language \*\*\* invites dynamic interpretation by both courts and the administrative agency charged with the statute's enforcement to determine the statute's application in particular cases in the light of developments in the country's immigration policy.' " *Berger v. Heckler* (2d Cir. 1985), 771 F.2d 1556, 1571.

Castillo and Jimenez cite extensive case law from other State courts as persuasive authority in support of their claim that they were living in the United States "under color of law" as of IRCA's effective date. In each of these decisions a reviewing court has given PRUCOL a broader interpretation than that suggested by either Department or Labor Department regulation. In some of these cases, claimants for a government benefit had not received personal assurances from INS that they would not be deported, but were found to be a member of a class of aliens covered by an INS policy or statutory mandate not to deport. *Department of Health & Rehabilitative Services v. Solis* (Fla. 1991), 580 So. 2d 146 (INS practice of not deporting Nicaraguan asylum applicants confirms PRUCOL status); *Industrial Comm'n v. Arteaga* (Colo. 1987), 735 P.2d 473, 480 (PRUCOL status based on operating instruction of the INS prohibiting deportation); *Lapre v. Department of Employment Security* (R.I. 1986), 513 A.2d 10, 12 (INS decision not to deport combined with instructions to applicant on how to regain permanent residence status confers PRUCOL status); *Division of Employment & Train-*

*ing v. Turynski* (Colo. 1987), 735 P.2d 469 (moratorium established by Federal government prohibiting deportation of class in which claimants were members gives PRUCOL status); *Gillar v. Employment Division* (1986), 300 Or. 672, 676-81, 717 P.2d 131, 135-37 (Federal statute prohibited alien's deportation until Attorney General made certain findings in his case; alien found to be PRUCOL); *Rubio v. Employment Division* (1984), 66 Or. App. 525, 674 P.2d 1201 (INS routine renewal of voluntary departure period while applicant waited for pending permanent resident status conferred PRUCOL status).

In other cases, courts have found "color of law" status based on INS's intention not to deport, even when that intention was inferred simply from INS's failure to take steps toward deportation after it had knowledge of the alien's presence in the United States. *Antillon v. Department of Employment Security* (Utah 1984), 688 P.2d 455, 459; *Cruz v. Commissioner of Public Welfare* (1985), 395 Mass. 107, 114, 478 N.E.2d 1262, 1266; *In re St. Francis Hospitals* (1979), 71 A.D.2d 110, 422 N.Y.2d 104, *aff'd* (1981), 53 N.Y.2d 825, 422 N.E.2d 830; *Alfred v. Florida Department of Labor & Employment Security* (Fla. App. 1986), 487 So. 2d 355, 357.

The Department distinguishes these decisions based upon the fact that in each case the alien seeking PRUCOL status had been known to the relevant authorities during the time period at issue. The Department argues that until an amnesty-eligible alien has come forward and made himself known to INS, it is unreasonable to conclude that such person lived in the United States "under color of law." We believe it is significant, however, that for six months after IRCA's passage neither Castillo nor Jimenez could have come forward to claim amnesty because INS neither distributed forms nor accepted applications until the last day Congress allowed, May 5, 1987. This is despite the fact that INS was em-

powered by Congress to begin accepting adjustment applications on the date of IRCA's passage, November 6, 1986. Unemployment Insurance Program Letter No. 12—87, Change 1 (Department of Labor, Employment and Training Administration Sept. 28, 1988), 54 Fed. Reg. 10114 (1989).

We have found only two tribunals which have squarely addressed the issue Castillo and Jimenez bring to us. In *In re Barazas* a claimant for unemployment benefits argued that while he was in the process of meeting the requirements of the amnesty legislation, but before he actually filed his claim for amnesty, he should be considered to be in the United States "under color of law." (*In re Barazas* (Or. Emp. Div. 1988), No. 88—P— 843.) The referee hearing the claim noted that Congress had conferred a special status on amnesty-eligible aliens and agreed that Barazas was PRUCOL from IRCA's effective date even though Barazas·was not individually known to INS until his amnesty claim was filed.

A different result was reached in *Brambila v. Board of Review* (1990), 241 N.J. Super. 216, 574 A.2d 992, *rev'd on other grounds* (1991), 124 N.J. 425, 591 A.2d 605. In *Brambila*, the Superior Court of New Jersey, Appellate Division, held that applicants for legalization who claimed amnesty after their base periods were not PRUCOL at the time work was performed. Although the claimants before the court had applied for amnesty and had been given work authorization, the court denied the claimants' unemployment benefits. The court based its decision, in part, on the fact that Labor Department regulations prohibit INS from giving retroactive effect to an alien's amnesty claim until the alien has been granted lawful temporary resident status. (*Brambila*, 241 N.J. Super. at 220, 574 A.2d at 995.) We note, however, that the New Jersey Supreme Court reversed *Brambila* on

appeal, specifically avoiding the PRUCOL issue. *Brambila*, 124 N.J. at 432, 591 A.2d at 609.

We think that it is significant that the Labor Department, in publishing its Unemployment Insurance Program Letter No. 12—87, Change 1 (Department of Labor, Employment and Training Administration Sept. 28, 1988), 54 Fed. Reg. 10113 (1989), changed its regulatory posture to allow States whose law contains the "lawfully present for purposes of performing services" category of aliens to treat amnesty-eligible aliens as being "lawfully present" from the date of IRCA's passage, *regardless of when during the statutory window an alien presented his claim for legalization.* This change was made in recognition that aliens could not claim legalized status under IRCA until May 5, 1987. If it is conceded that Castillo and Jimenez were "lawfully present for the purposes of performing services" from the date of IRCA's passage, it makes no sense to say that Castillo and Jimenez were not also "under color of law" as of such date. We find this to be the case because, as used in the Act, the "under color of law" prong of PRUCOL is a *less* restrictive requirement than the "lawfully present" requirement set out in FUTA. This is supported by the fact that PRUCOL is a broad, "fluid" term, not "prescriptive or formulaic." (*Berger*, 771 F.2d at 1571.) Once an alien is determined to be both "permanently residing in the United States" and "lawfully present" here, we believe it is only logical to also conclude that such alien is PRUCOL.

In addition, although we express no opinion as to the specific rationale of any of the holdings cited from other State jurisdictions, we believe that due to the comprehensive reform Congress meant for IRCA to effect, and considering the expansive reading the Federal courts have given PRUCOL, Castillo and Jimenez present a *more* compelling case for PRUCOL status than many of

the aliens granted PRUCOL status in these cases. Again, the appellate court's opinion deserves reiteration:

"Congress' commitment to aliens such as plaintiffs is demonstrated by the unique protections afforded them under IRCA. Legalization of a qualified alien under IRCA is *mandatory*. (8 U.S.C. §1255a(a) (1986).) Also, although the application period for filing for amnesty did not begin until some time after IRCA's effective date, aliens apprehended before the application period commenced and aliens apprehended during the first 11 months of the application period could not be deported, were to be granted authorization to engage in employment and were to be granted an 'employment authorized' permit, provided they could establish a *prima facie* case of eligibility. (8 U.S.C. §1255a(e) (1986).) Moreover, IRCA provided that its amendment to the [Nationality Act] which made it unlawful to hire, recruit or refer unauthorized aliens does not apply to aliens, like plaintiffs, who were employed prior to IRCA's effective date. *It is apparent that Congress intended to and did provide special protections to aliens such as the plaintiffs in this case.*" (Emphasis added.) 207 Ill. App. 3d at 809.

As the appellate court noted, any other interpretation of PRUCOL *vis-a-vis* IRCA would produce an anomalous result. Had Jimenez and Castillo been discovered by the INS after November 6, 1986, each would have been directed to apply for amnesty and neither would have been subject to deportation. As far as the Department was concerned at the time, at least, both men after apprehension would have been recognized as being PRUCOL. (207 Ill. App. 3d at 808.) But following IRCA's passage INS had no reason to apprehend either Jimenez or Castillo because Congress specifically proclaimed that neither could be deported. We believe the only reasonable interpretation of PRUCOL is for that phrase to include aliens like Jimenez and Castillo who made timely claims of amnesty under IRCA's legalization scheme.

## DECERTIFICATION

In summary, we conclude that IRCA was passed by Congress, at least in part, to confer a unique status on amnesty-eligible aliens which the Department is bound to recognize. Because we agree with Federal court decisions that have recognized the need to give PRUCOL an expansive interpretation, we find that the denial of unemployment compensation to claimants such as Castillo and Jimenez is at odds with Congress' intent in enacting IRCA and, therefore, with the General Assembly's intent in passing section 614 of the Act. While the Department is bound to administratively support Labor Department directives "to the fullest extent consistent with the provisions of [the] Act" (Ill. Rev. Stat. 1987, ch. 48, par. 616(B)), such administrative support must be abandoned when, as here, the Labor Department's administrative pronouncements are found by a reviewing court to be at odds with the law.

We have given careful consideration to the Department's warnings that our decision in this case could lead the Labor Department to decertify Illinois' unemployment insurance program because Illinois has "failed to comply substantially" with FUTA section 3304(a)(14)(A). (See 26 U.S.C. §3304(c) (1988); 20 C.F.R. par. 601.5(a)(3) (1991).) However, we believe that section 614 of the Act continues to fully conform to the requirements of FUTA. The Department assumes that the Labor Department would seek decertification of Illinois' unemployment insurance program simply because Illinois has joined the growing number of jurisdictions that interpret PRUCOL differently than does the Labor Department.

In addition, despite the Department's warnings, we doubt the Labor Department's desire to decertify Illinois' unemployment program. Although the Labor Department has the ultimate power to decertify Illinois if it

believes our interpretation of PRUCOL is substantially inconsistent with what Federal law requires, we believe that the Labor Department would, had it contemplated taking such drastic action following the appellate court's decision in this case, extended to us the courtesy of filing an *amicus* brief outlining such a position.

Accordingly, the judgment of the appellate court is affirmed.

*Affirmed.*